HARRIS, Chief Judge.
Charles E. Bradshaw, Jr. formed a corporation named The Summit Group of Central Florida, Inc. (Summit) for the purpose of marketing his property and other potential real estate listings. He was the sole stockholder[1] and the controlling director. Although it was estimated that “several hundred thousand dollars” would be necessary for the start-up of this company, the corporation was formed without any assets and operated by Bradshaw’s infusion of capital as needed. Such advances were entered on the books of the corporation as “loans” from Bradshaw. The “loans” were not supported by authorizing documents, provided for no interest, carried no due date and required no periodic payments.
Despite the fact that Summit’s president testified that “we would have to pay the loans back through commissions,” nothing in the corporate records requires any such repayment. As a matter of fact, it appears that, although commission checks were received from time to time during the period Summit was in operation, no payments were actually made to Bradshaw on the “loans.” The controller testified that Summit’s losses in 1990 were $258,246; in 1991, $374,287; and in 1992, $87,838, for a total over the life of Summit of $720,371. She also testified that as a result of the advances to cover these expenses, Summit owed Bradshaw (or another of his wholly owned companies) the sum of “$720,300 and some odd dollars.”
The record, therefore, does not reflect a pattern of repayments (or any repayment) from commissions received in the ordinary course of business while the company was in operation. This is probably because it was understood that any commissions would first be applied to operation costs and that only the excess of commissions over cost would be applied to the “loans.” Since the commissions received never even approached operation costs, it is not surprising that Summit made no payments to Bradshaw. Further, except for carrying the advances as “loans,” nothing in the corporate records reflects an obligation to repay the advances at all. Indeed most of the advances were made at a *191 time when the chance of repayment was remote at best.
Summit entered into a five-year lease with Robert Yeager, trustee. As an inducement for the lease, Yeager provided the first year free. During the second month of the second year (the second month a payment was due), Summit breached its lease and moved out. Shortly thereafter, Bradshaw permitted Summit to be dissolved. After Summit was dissolved, Bradshaw received $95,722.87 in commissions due Summit by having checks due to Summit deposited directly into his account.
Yeager recovered a judgment against Summit in the amount of $149,090.56. He then sued Summit and Bradshaw (and companies controlled by Bradshaw) based on several theories of fraudulent transfer. In addition, he attempted to pierce the corporate veil and hold Bradshaw personally liable for the debts of Summit.
We affirm the trial court in its holding that Yeager failed to present a ease justifying the piercing of the corporate veil; we reverse the trial court’s holding that Yeager failed to prove a fraudulent transfer under section 726.106(2), Florida Statutes (1988), which provides:
A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.
Bradshaw does not deny, and it is clear’ from the record in any event, that Bradshaw was an “insider,” that the loans, if in fact they were loans as opposed to capital investments, were antecedent, and that at the time of the transfers Summit was insolvent. Bradshaw contends, and the trial court so held, that section 726.106(2) has no application because the “transfers made to Mr. Bradshaw were made in the ‘ordinary course of business.’ ” This is a remarkable holding since at the time of the transfer, Summit was out of business — dissolved. It was not paying anybody for anything in the ordinary course of business. These payments were not even made by the debtor corporation. They were made by Bradshaw’s controller (not an officer of Summit, at least at the time of the transfer) who deposited the checks directly into Bradshaw’s account.
Finally, even if Summit had made the transfers while it was still in business, the transaction would not have been “in the ordinary course of business.” A similar question was before the Bankruptcy Court in In re Flight Management, Inc. v. Truver, 99 B.R. 477, 488 (M.D.Florida, 1989), and the court held:
The court has considered the transfers in question and concludes that the payments were not made in the ordinary course of business as contemplated by section 547(c)(2). First, the payments were made to an insider for, and on behalf of, an antecedent debt. Secondly, the loan from the defendant to the debtor was made under extraordinary circumstances (i.e. an emergency bailout to keep the business running) and was not properly evidenced by a promissory note. Third, the defendant is a college professor and is not ordinarily engaged in the business of lending money. Furthermore, there is no evidence of a prior course of dealing between the debtor and the defendant which would aid the court in its determination of whether payment was made in the ordinary course of business. Finally, there was no structured repayment schedule detailing when the payments were to be made, and instead, the debtor was free to repay the loan at will.
In our case, although Bradshaw regularly advanced operating costs to Summit and other of his wholly owned corporations as needed, he was not in the business of lending money. And the agreement to advance hundreds of thousands of dollars to a corporation for its operating costs is every bit as “extraordinary” as a bail-out loan. There were no documents authorizing the loan, no notes, no formal terms of repayment and no interest provision, and there was no evidence of prior repayments from commissions received. For all the foregoing reasons, we find the trial court erred as a matter of law in finding that the payments were made in the ordinary *192 course of business and, therefore, were not in violation of section 726.106(2).
The trial court’s ruling is, of course, internally inconsistent. While he ruled that the payments to Bradshaw were in the “normal course of business,” he nevertheless found such payments to be “preferential transfers” and required that they be returned to Summit for pro rata distribution. He apparently relies on Poe & Associates, Inc. v. Emberton, 438 So.2d 1082 (Fla. 2d DCA 1983). It is true that Poe, based either on the “trust fund doctrine” or the “directors as fiduciaries” theory (it is not clear which), held that “a corporate creditor has a cause of action against a director to whom the corporation paid a pre-existing debt at a time when it was insolvent.” Id. at 1085.
This ruling, however, was made in the absence of a statute. Since Poe, the legislature substantially codified the holding of Poe in section 726.106(2). But in doing so, the legislature provided that such a preferential transfer would not be voidable “if made in the ordinary course of business.” Section 726.109(6)(b). This provision modifies the holding in Poe to the extent that a preferential transfer made in the ordinary course of business is not prohibited so that without a finding of a violation of the statute, reimbursement would not be required.
Having determined that a fraudulent transfer under section 726.106(2) was proved, we have a more difficult question to answer and one not yet resolved by Florida courts. If one is required to restore funds which he has received as a result of a fraudulent transfer, is he nevertheless entitled thereafter to share pro rata in the distribution of those funds? Poe does not answer this question.
The trial judge improperly cites Poe for the proposition that the most a creditor can claim is the right to share pro rata with the other creditors in the distribution of the debtor’s assets. Instead, Poe merely cites with approval section 7469, W. Fletcher, Cyclopedia of the Law of Private Corporations (rev. perm. ed. 1981), which indicates that it is “the directors and other managing officers” (not the general creditors) who can at most claim a right of pro rata distribution. The same section points out that some cases hold that such insiders are not even considered creditors as against creditors who have no connection with the corporation. The Poe court made no decision as to whether pro rata distribution would be appropriate even in a preferential transfer case. It merely approved a cause of action.
But since Poe, we now have section 726.106(2) which makes the conduct involved herein “fraudulent.” By this section, the legislature made fraudulent any transfer to an insider for an antecedent debt when the debtor was insolvent, unless an appropriate defense was proved. A plain reading of this statute makes it clear that the legislature intended to treat insider antecedent debts differently from the debts of general creditors of insolvent corporations. It provided that so long as there is a non-insider creditor to assert the protection of the statute (i.e., so long as any debt is owed by the insolvent corporation to a general creditor), any payment (even pro rata) by an insolvent corporation to an insider on an antecedent debt will be deemed fraudulent.
Because Bradshaw is an insider claiming antecedent debts, he is not entitled to a pro rata share of the distribution of Summit’s assets. This is particularly true since he was forced to return the funds because they were received as a result of a fraudulent conveyance. If an insider is permitted to share pro rata in the funds he unsuccessfully attempts to take as a preferential transfer, there is nothing to discourage insiders from attempting to take advantage of ordinary business creditors.
AFFIRMED in part; REVERSED in part and REMANDED for further action consistent with this opinion.
DAUKSCH, J., concurs, without participation at oral argument.
PETERSON, J., concurs in result only.

. Although one share each was authorized to two other individuals, the record shows the stock was never issued.