1998 SD 99

**PRAIRIE LAKES HEALTH CARE SYSTEM, INC., Plaintiff and Appellee,**

v.

**Dwight R. WOOKEY, Defendant and Appellant,**

and

**Harold K. Wookey and Merna L. Wookey, Defendants.**

Nos. 20172, 20173.

Supreme Court of South Dakota.

Argued March 23, 1998.

Decided Aug. 19, 1998.

Thomas J. Linngren of Green, Schulz, Roby, Oviatt, Cummings & Linngren, Watertown, for plaintiff and appellee.

Curt R. Ewinger of Rice and Ewinger, Aberdeen, for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] After incurring a large hospital bill, the patient and his wife deeded all their real estate to their adult son. The Hospital sought to void the transfer as fraudulent, but despite the presence of several "badges of fraud," the circuit court found in favor of the patient, as the conveyance was in exchange for reasonably equivalent value. Although this finding was not clearly erroneous, we reverse the decision because a separate statute, not considered by the court, dealing with transfers to insiders, makes the conveyance fraudulent as a matter of law. On the other hand, we uphold the court's finding that the son may be held responsible for his father's medical care. Thus we affirm in part, reverse in part, and remand.

## Facts

[¶ 2.] Harold Wookey incurred substantial bills while a patient at Prairie Lakes Hospital in Watertown, South Dakota, from November 21 to December 19, 1993. At the time, he and his wife, Merna, owned approximately 1360 acres in Clark and Day counties. A large portion of this farmland was encumbered by mortgages in the Conservation Reserve Enhancement Program (CREP). Harold and the Hospital tried to work out payment terms, but to no avail. Eventually, the Hospital threatened to bring suit. With assistance of counsel, on September 21, 1994, Harold and Merna deeded their home and all their acreage to their son, Dwight Wookey, who agreed they would be allowed to live in the home rent free for the rest of their lives. The consideration exchanged for the transfer to Dwight included his assumption of the outstanding CREP debt, his promissory note and mortgage for $58,000 payable to Harold and Merna over twenty-five years with seven percent interest, his earlier payments on Harold and Merna's farm debts including real estate taxes, and his prior lump sum payment to the CREP as an early buyout for his parents.

[¶ 3.] Following Harold's second hospitalization in the fall of 1994, and his continued failure to pay his medical bills, the Hospital brought suit against both Harold and Merna in March 1995. The couple never responded, and a default judgment was entered against them on May 19, 1995 for $76,537, including prejudgment interest. The Hospital discovered the transfer of the farm the following summer, when it attempted to collect on its judgment. It sued Harold, Merna and Dwight in September 1995, to set aside the sale. A year later, the Hospital moved to amend its original complaint to include an additional cause of action against Dwight under SDCL 25-7-27 (making financially able adult children responsible for their parents' medical care). While reserving its ruling on the Hospital's motion to amend, the court heard the action to void the transfer. In October 1996, the trial court issued a memorandum decision denying the avoidance, concluding that the farmland was exchanged for reasonably equivalent value. The court found the property transferred was worth $332,560, and the consideration paid, both before and after the sale, totaled $355,360. The consideration included $148,360 on the assumption of the CREP debt, $149,000 for payments on antecedent debt, and $58,000 in the form of a promissory note.[1] Lastly, the court allowed the Hospital to amend its complaint to allege a cause of action for parental support and later granted its motion for summary judgment against Dwight for $70,091.

[¶ 4.] Dwight Wookey appeals. By notice of review, the Hospital also appeals contending the trial court erred in holding the trans-

---

1. When the Hospital attempted to liquidate the note at a sheriff's sale, Harold and Merna filed for Chapter 7 Bankruptcy. No one contends, however, that the bankruptcy in any way affects the issues to be decided in this case.

fer from Harold and Merna to Dwight was not avoidable. Because we conclude the conveyance to Dwight was a fraudulent transfer as a matter of law, we will rearrange the customary sequence of issues and discuss the fraudulent transaction problem first, as it will affect the parental support judgment against Dwight. Next, we will analyze Dwight's arguments that the court erred, in granting the Hospital's motion to amend its complaint to allege a cause of action pursuant to SDCL 25–7–27; in upholding as timely under that statute the notice given to Dwight nearly three years after medical services were provided to his father; in concluding Dwight had the financial ability to pay his father's medical expenses within the period of the applicable statute of limitations; in holding an adult child liable for medical services provided to a parent when the parent has the financial ability to pay at least part of the amount owed; and, in relying on SDCL 25–7–27, a statute purportedly so vague and indefinite in its application that it results in a denial of due process. Lastly, we will review the Hospital's assertion that it was improper for the trial court to award prejudgment interest on the parental support judgment against Dwight only from the time the Hospital served him with the motion to amend its complaint.

### 1. Legitimacy of the Transfer Under the UFTA

### A. Fraudulent Transfer Under SDCL 54–8A–4(a)

[¶ 5.] After a bench trial, the circuit court ruled that Harold and Merna's transfer of their property to Dwight was not voidable under the Uniform Fraudulent Transfer Act (UFTA). SDCL ch. 54–8A.[2] In reviewing a judge's findings in a court trial, we give no deference to conclusions of law; thus we review them under the de novo standard. *S.B. Partnership v. Gogue*, 1997 SD 41, ¶ 8, 562 N.W.2d 754, 756 (citing *Central Monitoring Serv., Inc. v. Zakinski*, 1996 SD 116, ¶ 17, 553 N.W.2d 513, 517). Conversely, we examine findings of fact under the more deferential clearly erroneous standard. *Gogue*, 1997 SD 41, ¶ 8, 562 N.W.2d at 756 (citing *Shedd v. Lamb*, 1996 SD 117, ¶ 17, 553 N.W.2d 241, 244). We will not overturn fact findings "unless we are definitely and firmly convinced a mistake has been made." *Cordell v. Codington Cty.*, 526 N.W.2d 115, 116 (S.D.1994).

[¶ 6.] In the aftermath of sweeping changes in laws regulating corporations, commercial transactions and bankruptcy, the Conference of Commissioners on Uniform State Laws decided to revamp the old Uniform Fraudulent Conveyance Act (UFCA), first promulgated in 1918.[3] *See* SDCL 54–8–5 through 19 (repealed)(South Dakota's version of the UFCA enacted in 1919). The result was the UFTA, adopted in South Dakota in 1987. Like the UFCA, the purpose of the UFTA is to thwart depletion of debtors' estates to the disadvantage of unsecured creditors. UFTA § 3, cmt. (2). The Act invalidates "otherwise sanctioned transactions made with a fraudulent intent." *In re Marriage of Del Giudice*, 287 Ill.App.3d 215, 222 Ill.Dec. 640, 678 N.E.2d 47, 49 (1997). Even valid transfers made without fraudulent intent, however, may be susceptible to avoidance as fraudulent under certain provi-

---

2. The UFTA provides no choice of law rules for fraudulent transfer actions. In this case, for example, what applicability might South Dakota's original general fraudulent transfer law have? *See* SDCL ch 54–8. We need not address the question now because both sides in this case rely exclusively on the UFTA.

3. The UFCA proceeded from an earlier enactment:

   The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated "covinous and fraudulent" transfers designed "to delay, hinder or defraud creditors and others." 13 Eliz. ch. 5 (1570). English courts soon developed the doctrine of

"badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. *See Twyne's Case*, 3 Coke Rep. 80b, 76 Eng. Rep. 809 (K.B.1601); O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors to Defraud Creditors 31–60 (3d ed. 1882).

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540–41, 114 S.Ct. 1757, 1763, 128 L.Ed.2d 556 (1994).

sions. *See* discussion *infra* Section B. A "determination that the transfer is fraudulent is conceptually distinct from the avoidance of the transfer, which is, in turn, separate and distinct from a recovery based upon the avoidance of a transfer." *In re Cohen*, 199 B.R. 709, 716 (9th Cir. BAP 1996).

▇▇▇ [¶ 7.] The UFTA subdivides fraudulent transactions into two categories: actually fraudulent transfers (SDCL 54–8A–4(a)(1)) and constructively fraudulent transfers (SDCL 54–8A–4(a)(2) and 54–8A–5). In deciding whether a transfer was actually fraudulent, the debtor's state of mind becomes the point of inquiry. SDCL 54–8A–4 provides in relevant part:

> (a) Any transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor....

A debtor's subjective intent is difficult to discern; direct proof to establish an actually fraudulent transfer is not required. Courts may consider the following list of objective factors in deciding whether the transfer was made with actual intent to hinder, delay, or defraud a creditor:

> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;
>
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;
>
> (6) The debtor absconded;
>
> (7) The debtor removed or concealed assets;
>
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

SDCL 54–8A–4(b). By the plain language of this statute, these eleven factors are nonexclusive considerations. *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.App.3d 241, 214 Ill.Dec. 1029, 662 N.E.2d 595, 601 (1996). In reviewing these elements, courts should consider all relevant particulars encompassing a questioned transaction and weigh the factors negating as well as suggesting fraud. UFTA § 4, cmt. (6). "The burden of persuasion remains on the plaintiff to show actual intent by a preponderance of the evidence." *Morris v. Nance*, 132 Or.App. 216, 888 P.2d 571, 575–76 (1994).

▇▇▇ [¶ 8.] Hearkening to earlier statutes and court rulings, some courts interpreting the UFTA hold that once a creditor establishes the existence of one or more of the eleven factors in § 4(b) or other nonlisted factors, then the burden shifts to the debtor to come forward with evidence that the transfer was not made to defraud a creditor. *Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 462 n. 18 (Utah Ct.App.1989); *Erjavec v. Herrick*, 827 P.2d 615, 617 (Colo.Ct. App.1992), *superseded by statute as noted by In re Thomason*, 202 B.R. 768 (Bankr. D.Colo.1996). Although an inference of fraudulent intent can be drawn from the list of factors in § 4(b) or other circumstances, the UFTA does not provide for a shifting of burdens no matter the number of factors present. *Morris*, 888 P.2d at 575. Nor are these "badges of fraud" to be understood as creating a "presumption" of fraudulent intent. UFTA § 4, cmt. (5).

▇▇▇ [¶ 9.] The trial court, after finding the transfer was made to an insider, that the debtor retained possession of his home, that

before the transfer was made Harold Wookey had been threatened with suit, that the transfer encompassed most of Harold and Merna's assets, and that the transfer occurred shortly after a substantial debt was incurred, nonetheless concluded the transfer was not fraudulent because the property was exchanged for reasonably equivalent value. In arriving at its decision, the court took measure of the value of the property transferred and the amount of consideration exchanged.

[¶ 10.] Both the Hospital and the Wookeys hired expert witnesses to conduct independent appraisals of the subject property. The trial court considered the expert opinions, then independently valued the property by using the normal rental rate of like property in the surrounding area. *See ARC Machining & Plating, Inc. v. Dimmick*, 238 A.D.2d 849, 656 N.Y.S.2d 549, 550 (1997)(trial court enjoys broad discretion to reject expert testimony and to determine value within the range of expert testimony or supported by other evidence and adequately explained by the court); *Studt v. Studt*, 443 N.W.2d 639, 641 (S.D.1989); *Filipetti v. Filipetti*, 2 Conn. App. 456, 479 A.2d 1229, 1230 (1984). Although the Hospital argues that its valuation should have been accepted, from our review of the record we cannot say the court's value was clearly erroneous.

[¶ 11.] The Hospital asserts that the trial court should have disregarded certain "additional" consideration disclosed in the Wookeys' supplemental responses to the Hospital's interrogatories, as this consideration was not initially mentioned when the Wookeys were first asked to explain the sale. Both Harold and Dwight testified at trial, however, that the payments the Hospital categorizes as "additional" consideration, had been made by Dwight for the benefit of Harold and Merna, and that these payments were considered debt that someday would be extinguished through a land transfer to Dwight. Whether this testimony should have been accepted or rejected turned on the court's evaluation of credibility. "The circuit court is in the best position to assess the witnesses' credibility and the weight to be given their testimony, and we give great deference to the circuit court's opportunity to observe the witnesses and testimony first hand." *Englehart v. Larson*, 1997 SD 84, ¶ 19, 566 N.W.2d 152, 156; *Cowan v. Mervin Mewes, Inc.*, 1996 SD 40, ¶ 15, 546 N.W.2d 104, 109; *In re Estate of Elliott*, 537 N.W.2d 660, 662 (S.D.1995). The Wookeys acknowledged these payments were not initially disclosed, but their eventual testimony at trial fully supports the trial court's findings. "Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of facts." *Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298 (N.D.Ill.1997). Ultimately, courts must examine what debtors received in exchange for what they surrendered. *Id.* at 301 (citing *Matter of Bundles*, 856 F.2d 815, 824 (7th Cir.1988)).

[¶ 12.] In the case of *In re Mussa*, 215 B.R. 158 (Bkrtcy.N.D.Ill.1997), a Chapter 7 trustee filed an adversary complaint seeking to avoid as fraudulent the debtors' transfers of their business and personal assets to their son that began shortly after the debtor-husband was hospitalized and incurred substantial medical bills. The court held, under the Illinois version of the UFTA, that the debtors conveyed their assets in violation of both the actual and constructive fraud provisions. The debtors had argued that their purpose was to "carry out an Albanian tradition that the eldest son receive family property so as to care for his parents." *Id.* at 170. That case is distinguishable from the Wookeys' transfer in at least one respect. There, the court found no reasonably equivalent value in consideration for the transfers. Value inequivalence, though not determinative by itself, is certainly a major factor in discerning a fraudulent transfer.

[¶ 13.] The Hospital also contends that the trial court's conclusion the property was transferred for reasonably equivalent value is outweighed by six of the seven relevant factors in SDCL 54–8A–4(b) that fit the Wookeys' transaction. (The Hospital submits that factors 3, 6, 7 and 11 are not relevant to this case.) No factor or set of factors need be given talismanic significance—they are only indicia, which by them-

selves or in combination with others may give rise to an inference of fraudulent intent. Frank R. Kennedy, *The Uniform Fraudulent Transfer Act,* 18 UCC LJ 195, 201 (1986). Of course, cases of alleged fraudulent transfers between family members invite the most careful inspection.[4] *See New Horizon Enter., Inc. v. Contemporary Closet Design, Inc.,* 570 N.W.2d 12, 15 (Minn.Ct.App.1997); *Merrell v. Beckwith,* 263 Ga. 779, 439 S.E.2d 488, 489 (1994)(transactions between relatives closely scrutinized for evidence of fraudulent conveyance). Yet, we conclude the Hospital has not shown that the trial court was clearly erroneous in placing great weight on its finding that Dwight paid reasonably equivalent value for the property. This does not end the inquiry, however.

### B. Insider Transfer Under SDCL 54–8A–5(b)

■■■■ [¶ 14.] One of the innovations in the UFTA is its adoption of a bankruptcy concept to create a novel category of fraudulent transaction, the preferential transfer. It has been characterized as constructive fraud or fraud in law. SDCL 54–8A–5(b) states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Even though it has been held that debtors may generally prefer one creditor over another in applying assets to discharge their obligations, § 5(b) curtails this privilege if the debtor is insolvent at the time and the preference is to an insider. *See Textron Fin. Corp. v. Kruger,* 545 N.W.2d 880 (Iowa Ct.App.1996)(generally debtors may prefer one creditor over another). The rationale behind § 5(b) "is that an insolvent debtor is obliged to pay debts to creditors not related to [the debtor] before paying those who are

insiders." UFTA, Prefatory Note. This provision attempts to diminish the unfair advantage insiders sometimes possess when they are familiar with the debtor's financial substance. Unlike its bankruptcy counterpart, however, § 5(b) permits avoidance not for the benefit of all unsecured creditors, but only for the benefit of a plaintiff creditor.[5] A debtor's intent in transferring assets is immaterial to a constructively fraudulent transfer under § 5(b). Proof of its elements "establishes fraud conclusively—i.e., without regard to the actual intent of the parties...." UFTA § 4, cmt. (5). Some might call this an irrebuttable presumption; yet as Professor Larson instructs, it is not a true presumption, but a substantive rule. John W. Larson, South Dakota Evidence § 301.1, at 86 (1991).

■■■■ [¶ 15.] The trial court correctly found that at the time of the transfer Dwight was an insider as defined in SDCL 54–8A–1(7)(i)(A), but it overlooked the import of SDCL 54–8A–5(b). To void a transfer under this section the following elements must be established: (1) The creditor's claim arose before the transfer; (2) the transfer was made to an insider; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time; and (5) the insider had reasonable cause to believe the debtor was insolvent. *See Alcan Bldg. Prods. v. Peoples,* 124 Idaho 338, 859 P.2d 374, 376–77 (Ct.App.1993)(stating the same test in four factors).

■■■■ [¶ 16.] The evidence firmly establishes each element: (1) The Hospital's claim arose before the transfer to Dwight. (2) Dwight was an insider. (3) The transfer was in consideration of an antecedent debt (in large part the obligation Harold and Merna had to repay Dwight the amounts he paid to retire the CREP mortgage and other farm debts). Dwight's pre-conveyance payments to certain third parties on behalf of Harold

---

4. This Court has long examined with skepticism allegedly fraudulent transactions when the transfers are between relatives. *First Nat'l Bank of Beresford v. Anderson,* 291 N.W.2d 444, 446 (S.D. 1980); *Counts v. Kary,* 67 S.D. 607, 297 N.W. 442 (1941); *Lane v. Starr,* 1 S.D. 107, 45 N.W. 212 (1890); *see* SDCL 54–8–1.

5. Some states have declined to enact § 5(b) of the UFTA because, among other reasons, it merely shifts the benefit of the preference from the insider creditor to the plaintiff creditor.

and Merna created an antecedent debt because they were made, as Harold and Merna testified, as part of their plan to eventually convey the farm to Dwight. *Morris*, 888 P.2d at 573; *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 191 A.D.2d 690, 595 N.Y.S.2d 537, 538 (1993) (antecedent debt can be fair consideration under UFCA for purposes of determining whether conveyance was fraudulent). (4) Using the UFTA's "balance sheet" approach, Harold and Merna's debts exceeded their assets both before and after the transfer; therefore, they were insolvent. SDCL 54–8A–2(a) declares "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." The burden of proving such insolvency rests upon the party challenging the conveyance. *Sportsco Enter. v. Morris*, 112 Nev. 625, 917 P.2d 934, 937 (1996); *Dearing v. A.R. III, Inc.*, 266 Ga. 301, 466 S.E.2d 565, 566 (1996); *American Inv. Bank, N.A.*, 595 N.Y.S.2d at 538. Insolvency must be determined at the time of the alleged fraudulent transfer. *First Nat'l Bank v. Frescoln Farms, Ltd.*, 430 N.W.2d 432, 437 (Iowa 1988)(debts exceeded debtor's assets after transfer). Harold testified at trial that he and Merna had a negative net worth of $200,000 before the transfer and a negative net worth of $75,000 afterwards. Furthermore, as Harold and Merna were not paying their debts as they came due, they were presumed insolvent. SDCL 54–8A–2(b).[6] They had $40,000 in credit card debt.

Dwight had paid Harold's delinquent taxes, a judgment against Harold for aerial spraying, and Harold's overdue custom combining bill for which he was being threatened with suit. (5) Because Dwight was paying these debts for his parents he had reasonable cause to believe they were insolvent. Consequently, under SDCL 54–8A–5(b) the transfer of the farm to Dwight was fraudulent as a matter of law. The next question is whether any of the defenses in SDCL 54–8A–8(f) will apply to defeat avoidance of the transaction.

## C. Defenses to Avoidance of Insider Transfer—SDCL 54–8A–8(f)

[¶ 17.] Once the elements of SDCL 54–8A–5(b) have been shown, a fraudulent transfer is conclusively established regardless of the actual intent of the parties. UFTA § 4, cmt. (5). Nonetheless, the UFTA then authorizes three possible defenses to forestall avoidance. The burden of qualifying for these falls to the one asserting them.[7]

> (f) A transfer is not voidable under subdivision 54–8A–5(b):
>
> (1) To the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;
>
> (2) If made in the ordinary course of business or financial affairs of the debtor and the insider; or

---

6. The UFTA's comment states, "The presumption imposes on the party against whom the presumption is directed the burden of proving that the nonexistence of insolvency ... is more probable than its existence." UFTA § 2, cmt. (2). *But see* SDCL 19–11–1 (substantial, credible evidence required). *See also Bell v. East River Elec. Power Coop., Inc.*, 535 N.W.2d 750, 755 (S.D.1995)(quoting John W. Larson, *South Dakota Evidence* § 301.1 (1991)(discussing difficulties with South Dakota's presumption statute)). The drafters of the UFTA rejected the "bursting bubble" theory of when a presumption is overcome. *See* Larson, § 301.1 discussing the criticisms of the federal rule and particularly South Dakota's variation of that rule. Although the UFTA comments may suggest a more sound approach on how a presumption is overcome, our Legislature did not enact the UFTA comments, so we view them as merely advisory. In this instance, the comments conflict with SDCL 19–11–1; thus our own rules of evidence must prevail and therefore a debtor has the burden of bringing "substantial,

credible evidence" to rebut presumed insolvency. In this case, however, the Wookeys effectively admitted insolvency.

7. These defenses, adopted from § 547(c)(2) of the Bankruptcy Act, place the burden on the transferee to prove by a preponderance of the evidence the required elements. *See* 11 USC § 547(g). Although the UFTA comments do not directly address the burden question, we conclude based upon our own laws and the bankruptcy laws that the person asserting these defenses bears the burden of persuasion. Thus, once a plaintiff establishes a fraudulent transfer under § 5(b), the burden shifts to the person asserting a § 8(f) defense to prove nonavoidability. *See* UFTA § 8 cmt. (1), with respect to § 8(a) good faith: "The person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged."

(3) If made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

SDCL 54–8A–8(f). In his appellate brief, Dwight asserts that all three defenses preclude avoidance.

[¶ 18.] (1) New Value—SDCL 54–8A–8(f)(1). This defense is an adaptation from the Bankruptcy Code § 547(c)(4) and like that provision its availability is limited to creditors who make unsecured advances. 11 U.S.C. § 547(c)(4); UFTA § 8, cmt. (6). Moreover, the "new value" must be made after, rather than contemporaneously with, the transfer. The note Dwight gave was at the same time as the land transfer, thus the defense is unavailable.

[¶ 19.] (2) Ordinary Course of Business—SDCL 54–8A–8(f)(2). Like the new value defense, § 8(f)(2) is also derived from the Bankruptcy Code. 11 U.S.C. § 547(c)(2). This defense seeks to reaffirm the parties' continued practice as shown by a baseline of past dealings.

> Whether a transfer was in the "ordinary course" requires a consideration of the pattern of payments or secured transaction engaged in by the debtor and the insider prior to the transfer challenged under § 5(b). (citation omitted). The defense provided by paragraph (2) is available, irrespective of whether the debtor or the insider or both are engaged in business, but the prior conduct or practice of both the debtor and the insider-transferee is relevant.

UFTA § 8, cmt. (6). Unlike the Bankruptcy Code, however, § 8(f)(2) does not require that the transfer be made in payment of a debt incurred in the ordinary course of business, or that it be made according to ordinary business terms. *See* 11 U.S.C. § 547(c)(2)(A) and (C). No precise legal standard governs when a debtor's payments may be considered as made in the ordinary course: Courts must engage in a "peculiarly factual" analysis. *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991) (citations omitted).

[¶ 20.] Under § 8(f)(2) only the parties' prior dealings are examined to decide whether a transfer was made in the ordinary course of the parties' business affairs. In all the cases we have examined, this means looking at the payment history to decide if a preferential transfer was made in the ordinary course. Here, there is no history of payments from Harold and Merna to Dwight. This transaction, the transfer of all their assets, was their one and only payment to him. Nonetheless, may this conveyance be viewed as merely a closing in the ordinary course of the Wookey estate plan?

[¶ 21.] In South Dakota, families traditionally pass on farming businesses to their children, sometimes by contract or bequest, but often by less structured arrangements. Many such plans may invariably include donative aspects as well as long-term buy-outs. To decide if this transfer comes within the purview of SDCL 54–8A–8(f)(2), we need a greater understanding of the term "ordinary course of business or financial affairs." It has no specific definition in the UFTA and few cases interpreting it are available for guidance. In *Yeager v. Summit Group of Cent. Fla., Inc.,* 654 So.2d 189, 191 (Fla.Dist. Ct.App.1995), the court reversed a decision that transfers the debtor made to an insider in repayment of an antecedent debt were in the ordinary course of business because the company was out of business, dissolved, and was not "not paying anybody for anything in the ordinary course of business." In *United Jersey Bank v. Vajda,* 299 N.J.Super. 161, 690 A.2d 693, 694 (App.Div. 1997), the court characterized as "patently fraudulent" under New Jersey's version of the UFTA § 5(b) a debtor's asset transfers to his sister for "some money," "maybe $50,000," he owed her. They had no promissory note to document the debt.

[¶ 22.] Because there are so few reported cases interpreting the UFTA § 8(f)(2) defense and because this provision is derived from the Bankruptcy Code's exception to avoidance in 11 U.S.C. § 547(c)(2), we explore bankruptcy decisions interpreting the latter provision for insight into the meaning of the concept of ordinary course of business or financial affairs. In the bankruptcy con-

text, the "ordinary course" exception in § 547(c)(2) was designed to "leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage *unusual action* by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 95–595, at 373, *reprinted in* 1978 USCCAN 6329, *quoted in Union Bank v. Wolas,* 502 U.S. 151, 160, 112 S.Ct. 527, 532, 116 L.Ed.2d 514, 523 (1991) (emphasis added). The exception is available whether the transfer was in payment of long-term or short-term debt. *Id.* As it examines the past dealings between the debtor and creditor only, this test has been characterized as a subjective one. *In re Fred Hawes Org., Inc.,* 957 F.2d 239, 244 (6th Cir.1992).

[¶ 23.] In dealing with "ordinary course" questions, bankruptcy courts have examined (1) the time the parties engaged in the type of dealing at issue, (2) whether the subject transfer was for an amount more than usually paid, (3) if the payment was tendered in a manner different from previous payments, (4) whether there was unusual action by either the debtor or the creditor to collect or pay on the debt, and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition. *See In re Grand Chevrolet, Inc.,* 25 F.3d 728, 732 (9th Cir.1994); *Fred Hawes,* 957 F.2d at 244. Typically these circumstances encompass preferential payments on business loans or home mortgage loans, but "ordinary course" transfers can include more complicated transactions. In the case of *In re Flight Management, Inc.,* 99 B.R. 477, 480 (Bkrtcy. M.D.Fla.1989), the court held that a debtor's repayment of certain advances constituting an emergency bailout to keep the business running was not made in the ordinary course of business under § 547(c)(2) because it was an extraordinary transaction, there was no promissory note, the defendant was a college professor not ordinarily in the business of lending money, there was no evidence of a prior course of dealing between the parties to aid the court in deciding whether the payment was made in the ordinary course of business, and there was no fixed repayment schedule.

[¶ 24.] Whether as part of a purported estate plan or otherwise, we can find no case, nor has a single one been cited to us, that upholds as being in the "ordinary course" a preferential transfer of an entire business in payment of an antecedent debt. What we glean from these decisions, however, is that belated, unusual, precipitous, inordinate or haphazard transfers will not usually be considered ordinary course transactions. In truth, except for the exchange of equivalent value (not a relevant factor under § 5(b) or a defense under § 8(f)), this case exemplifies the archetypal fraudulent transfer—virtually all an insolvent debtor's property transferred to a family member thus defeating a creditor's imminent judgment while the debtor continues to reside on the property. If there is to be any preference, the UFTA's avowed premise under § 5(b) favors those creditors who are not insiders.

[¶ 25.] For the following reasons, we conclude that the "ordinary course" defense is inapplicable. (1) This transaction more closely corresponds to the consummation of a sale, rather than delineates customary repayment of a loan or payment on an obligation. The transfer of the farmland was extraordinary, effectively ending a business in payment of a debt. Despite Dwight's earlier payments over the years, no portion of the farm had ever been conveyed to him. The farm was worth more than what Dwight was owed; hence, the promissory note and mortgage back to his parents. This arrangement enabled Dwight to get more than he would have received had he simply been one of Harold and Merna's unsecured creditors. (2) The timing of the transfer was unusual in that it was not fixed by any historical course of dealings nor set to occur after reaching some pre-agreed benchmark. It occurred at a time when a lawsuit was imminent. Harold and Merna were in the business of farming, not in the business of extending credit, as they did in taking a note and mortgage from Dwight to complete the sale, an arrangement they had never engaged in before with him. *See In re Flight Management, Inc.,* 99 B.R. at 480 (interpreting 547(c)(2) of the Bankruptcy Code). (3) At the time of the conveyance, Dwight and Merna were not paying

many of their other bills in the ordinary course of business or otherwise. *See Yeager,* 654 So.2d at 191 (interpreting Florida's version of the UFTA). (4) Despite Dwight's payments over the years, no written agreement, promissory note, or other memoranda documented the parties' understandings regarding the sale of the farm, until the actual sale was consummated. Before that time, whatever understanding existed between Dwight and his parents on the eventual conveyance of the property was entirely unstructured. Thus, they never established any "ordinary course" to their business or financial affairs.[8]

[¶ 26.] (3) Good Faith Effort to Rehabilitate—SDCL 54–8A–8(f)(3). "The amount of the present value given, the size of the antecedent debt secured, and the likelihood of success for the rehabilitative effort are relevant considerations in determining whether the transfer was in good faith." UFTA § 8, cmt. (6). We deem this defense inapplicable because the transfer was obviously not made to rehabilitate Harold and Merna, but to dispose of their entire real estate holdings and thus end their ownership of the farming business.

[¶ 27.] Harold and Merna's grant of all their real estate was a fraudulent transfer as a matter of law under SDCL 54–8A–5(b) and none of the defenses they assert under SDCL 54–8A–8(f) are applicable. The circuit court's judgment denying the Hospital's claim to set the transfer aside is reversed.[9]

### 2. Motion to Amend

[¶ 28.] The trial court allowed the Hospital to amend its complaint to include a new count against Dwight for his father's medical expenses a year after it commenced its action against the Wookeys on the fraudulent transfer claim. Motions to amend en- gage the sound discretion of the trial court; thus decisions to grant or deny will not be disturbed absent a clear abuse of discretion resulting in prejudice to the nonmovant. *Ripple v. Wold,* 1996 SD 68, ¶ 11, 549 N.W.2d 673, 676 (citing *Kjerstad v. Ravellette Publications, Inc.,* 517 N.W.2d 419, 423 (S.D. 1994)). "A trial court may permit the amendment of pleadings before, during, and after trial without the adverse party's consent." *Tesch v. Tesch,* 399 N.W.2d 880, 882 (S.D.1987). SDCL 15–6–15(a) provides in relevant part that "[l]eave [to amend] shall be freely given when justice so requires."

[¶ 29.] Before allowing pleadings to be amended, the court should decide if the opposing party will be prejudiced. The inquiry should center on whether the nonmoving party has a fair opportunity to litigate the new issue and to offer additional evidence if the case will be tried on a different point. *Americana Healthcare Ctr. v. Randall,* 513 N.W.2d 566, 571 (S.D.1994). "A plaintiff typically will not be precluded from amending a . . . complaint in order to state a claim on which relief can be granted or from adding a claim to an otherwise proper complaint *simply because that amendment may increase defendant's potential liability.*" 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1487 (1990)(emphasis added).

[¶ 30.] Dwight has not shown prejudice in allowing the Hospital to amend its complaint to include a claim under SDCL 25–7–27. At the Hospital's request, the trial court bifurcated the claims and proceeded first with the fraudulent transfer case as originally scheduled. Much of the information obtained by the parties in preparing for trial on the fraudulent transfer claim served as well for the filial responsibility count. Dwight Wookey has not demonstrated that he was unprepared to meet the facts supporting the

---

8. *See* DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule,* 20 Akron L.Rev. 95, 126 (1986):

> The real problem is to determine if the parties' past practice had reasonable and ascertainable boundaries. If so, and the transfers in question fell within them, then it should be protected. However, if past conduct was so random and haphazard that it yields no reasonable,

ascertainable boundaries, then the transfers should not be considered ordinary.

9. Although we determine that the transfer was fraudulent under SDCL 54–8A–5(b), the Hospital may only obtain avoidance of the transfer to the extent necessary to satisfy its outstanding judgment. *See* SDCL 54–8A–7. *See also* SDCL 54–8A–8(d), good faith transferee entitled to extent of value given to debtor under certain circumstances.

amended complaint. Therefore, we find no abuse of discretion.

### 3. Notice Pursuant to SDCL 25-7-27

[¶ 31.] Dwight next asserts that he was not provided with timely notice of the Hospital's claim, as required by SDCL 25-7-27:

Every adult child, having the financial ability so to do shall provide necessary food, clothing, shelter or medical attendance for a parent who is unable to provide for himself; provided that no claim shall be made against such adult child until notice has been given such adult child that his parent is unable to provide for himself, and such adult child shall have refused to provide for his parent.

The Hospital concedes Dwight had no notice until September 3, 1996, the date it moved to amend its original complaint. Dwight believes the notice contemplated by SDCL 25-7-27 must be given within a short period of time after the care is provided. Based on our reasoning in *Randall, supra,* we disagree.

[¶ 32.] In the absence of any particular method of giving notice required in SDCL 25-7-27, we think reasonable notice is sufficient. *Randall,* 513 N.W.2d at 574. We discussed what was constitutionally required for reasonable notice in *First Nat'l Bank of Eden v. Meyer,* 476 N.W.2d 267, 269 (S.D. 1991):

In *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), the United States Supreme Court in determining what notice is constitutionally adequate to satisfy due process stated:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

Based on *Meyer,* the notice requirements of SDCL 25-7-27 were met here. The Hospital provided Dwight notice of its claim well before it filed its motion for summary judgment in May 1997. During the interim, Dwight had an opportunity to conduct discovery on the claim, and to contest, as best he could, its validity. Dwight asserts he should have been given notice sooner. Due process requires only reasonable notice and an opportunity to be heard at a "meaningful time and in a meaningful manner." *Gogue,* 1997 SD 41, ¶ 16, 562 N.W.2d at 758 (citing *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32 (1976) quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965)). Here, Dwight had that opportunity, and although he insists that had he been afforded earlier notice, he might have sought alternative care for his father, he presents us with no remedy he actually lost from the Hospital's delayed claim. Accordingly, we conclude he received constitutionally adequate notice.

### 4. Liability for Medical Care for Parent Unable to Pay

[¶ 33.] The circuit court granted summary judgment against Dwight on the Hospital's claim pursuant to SDCL 25-7-27. The framework for determining summary judgment questions is set forth in SDCL 15-6-56(c): "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (reproduced in part); *Ward v. Lange,* 1996 SD 113, ¶ 10, 553 N.W.2d 246, 249. On review, "[w]e will affirm only when the legal questions have been correctly decided and there is no genuine issue of material fact." *Koeniguer v. Eckrich,* 422 N.W.2d 600, 601 (S.D.1988); *Bego v. Gordon,* 407 N.W.2d 801, 804 (S.D.1987). Of course, the construction of a statute and its application to particular facts present a question of law, reviewable de novo. *Bosse v. Quam,* 537 N.W.2d 8, 10 (S.D.1995)(citing *Schoenrock v. Tappe,* 419 N.W.2d 197, 201 (S.D.1988); *Johnson v. Rapid City Softball Ass'n,* 514 N.W.2d 693, 695 (S.D.1994)).

[¶ 34.] SDCL 25-7-27 requires an adult child to provide support for an indigent parent *only* when that child has the financial ability. *Randall,* 513 N.W.2d at 571 (emphasis added). This requirement is consistent

with interpretations given by other courts across the country. *Landmark Medical Ctr. v. Gauthier,* 635 A.2d 1145, 1154 (R.I.1994); *Gluckman v. Gaines,* 266 Cal.App.2d 52, 71 Cal.Rptr. 795, 797 (1968); *Britton v. Steinberg,* 208 Cal.App.2d 358, 24 Cal.Rptr. 831, 832 (1962); *Commonwealth v. Goldman,* 180 Pa.Super. 337, 119 A.2d 631, 632 (1956); *Thornsberry v. State Dep't of Pub. Health & Welfare,* 365 Mo. 1217, 295 S.W.2d 372, 376 (1956); *Cherokee Cty. v. Smith,* 219 Iowa 490, 258 N.W. 182, 185 (1935). *See also* Terrance A. Kline, *A Rational Role for Filial Responsibility Laws in Modern Society?,* 26 Fam LQ 195, 197 (Fall 1992)("All states with filial responsibility statutes require courts to determine that children have sufficient assets before it will impose liability."). The financial ability of an adult child may be determined at any time there is an outstanding debt not barred by the statute of limitations. *Randall,* 513 N.W.2d at 571.

[¶ 35.] We recognize that Dwight has a compelling moral and legal duty to also support his wife and children, but the trial court reasoned, and we think correctly, that even if Dwight cannot pay the entire medical bill at one time, he could pay it in installments. With his recent acquisition of his parents' farm, he possesses considerable financial leverage.[10] Within the next year the mortgage debts on the farm will all be retired. Dwight also earns a salary of approximately $27,672 per year in his job.

[¶ 36.] Nonetheless, as our ruling makes the conveyance of Dwight's parents' farm avoidable, Dwight's ability to pay must be reexamined. We cannot anticipate what will happen on remand, but if the Hospital satisfies its judgment against Harold and Merna, the case against Dwight would be moot. For these reasons, the matter is remanded for further proceedings.

### 5. Award of Prejudgment Interest

[¶ 37.] With respect to any judgment against Dwight under SDCL 25-7-27, the Hospital asserts that an award of prejudgment interest accruing from the time Harold received medical services would be appropriate. *See South Dakota Bldg. Auth. v. Geiger–Berger Assoc. P.C.,* 414 N.W.2d 15, 19 (S.D.1987). The general rule under SDCL 21-1-11 provides for an award of prejudgment interest when the amount payable can be readily ascertained by calculation. *Id.* Here, the parties do not dispute the amount of the medical services. Dwight contends that prejudgment interest would be proper only from the time the Hospital served its motion to amend its complaint. We agree and affirm the circuit court on this issue. Up to that time, Dwight had no formal notice the Hospital was seeking direct contribution from him.

[¶ 38.] Affirmed in part, reversed in part, and remanded.

[¶ 39.] MILLER, C.J., and SABERS, AMUNDSON, JJ., concur.

[¶ 40.] GILBERTSON, J., concurs in part and dissents in part.

GILBERTSON, Justice (concurring in part and dissenting in part).

[¶ 41.] I concur on all issues expect I respectfully dissent on Issues Number Three and Four. I would hold the trial court abused its discretion in allowing the claim against Dwight to proceed as Dwight did not have reasonable notice of the claim against him by the hospital as is required by SDCL 25-7-27

---

**10.** Dwight further claims that an adult child is not liable for the necessary medical expenses incurred by a parent when the parent has the financial ability to pay at least part of the expense owed. He cites us to no authority for this proposition, and, therefore, the issue is deemed waived pursuant to SDCL 15-26A-60(6). *Sporleder v. Van Liere,* 1997 SD 110, ¶ 25, 569 N.W.2d 8, 14 (citations omitted). Additionally, Dwight claims SDCL 25-7-27 is so vague and indefinite that it results in a denial of due process. Appellate counsel admitted during oral arguments, however, that the constitutionality of this statute was not raised or argued below. Therefore, the issue is, likewise, waived. It is well established that the constitutionality of a statute cannot be raised for the first time on appeal. *Kern v. City of Sioux Falls,* 1997 SD 19, ¶ 12, 560 N.W.2d 236, 239; *Sharp v. Sharp,* 422 N.W.2d 443, 445 (S.D.1988). Although we may exercise our discretion and review a constitutional issue raised for the first time on appeal, we decline to do so here because we are not presented with a "compelling case" and perhaps more importantly, the issue is not "a matter of existing emergency to the public policy of [this] state." *South Dakota Bd. of Nursing v. Jones,* 1997 SD 78, ¶ 28, 566 N.W.2d 142, 148 (citations omitted).

and the due process clauses of the United States and South Dakota Constitutions.

[¶ 42.] At common law, an adult child was not required to support his parents. Thus, the only basis for this claim is by statute, in this case SDCL 25-7-27. *Americana Healthcare Center v. Randall*, 513 N.W.2d 566, 571 (S.D.1994). SDCL 25-7-27 states:

Every adult child, having the financial ability to do shall provide necessary food, clothing, shelter or medical attendance for a parent who is unable to provide for himself; provided that no claim shall be made against such adult child until notice has been given such adult child that his parent IS unable to provide for himself, and such adult child shall have refused to provide for his parent (emphasis added).

[¶ 43.] Harold was initially hospitalized from November 21 to December 19, 1993. The hospital knew at that time Harold had no hospitalization insurance. A second hospitalization occurred in the fall of 1994. Again, the hospital knew Harold had no hospitalization insurance and it further knew it had not been paid anything from Harold's first hospitalization. According to the hospital, it only "learned of the transfer[11] for the first time during the summer of 1995." However, the hospital did not seek to raise a claim until September 3, 1996 when it finally notified Dwight of its intention to do so.

[¶ 44.] The explicit language of SDCL 25-7-27 states that no claim shall be made against such adult child except when his parent "is" unable to provide for himself or herself. The use of the word "is" is in the present tense and indicates an inability to pay concurrent with the treatment or shortly thereafter. Allowing notice years after the fact amounts to a de facto amendment of the statute to "was" unable to pay at the time of treatment or for a reasonable period thereafter. This is not mere quibbling over semantics as the time of the notice affects the child's ability to respond.

[¶ 45.] Fundamental fairness requires reasonable notice which provides one an opportunity to be heard within a reasonable time and in a meaningful manner. *S.B. Partnership v. Gogue*, 1997 SD 41, 562 N.W.2d 754. In dealing with the notice issue as it applies to county indigent relief, we have required prompt notice in strict accordance with the applicable statute. SDCL 28-13-34.1 (notice must be given within fifteen days in the case of an emergency admission or within seven days of a nonemergency admission). We held in *Appeal of Presentation Sisters Inc.*, 471 N.W.2d 169, 174 (S.D.1991):

The purpose of this notice of emergency hospitalization is to put the county on notice that one of its indigent residents is in the hospital, that the hospital intends to . seek payment from the county for its services, and that the county has the option of obtaining alternate arrangements for hospitalization pursuant to SDCL 28-13-35.

If this be the purpose of these types of notices, what good is it to give Dwight notice three years after the initial (and most expensive) hospitalization and two years after the second hospitalization. At that point, his options are long gone and his defenses few.[12] What is his meaningful opportunity to be able to timely present his objections? *First Nat. Bank of Eden v. Meyer*, 476 N.W.2d 267, 269-270 (S.D.1991) (*citing Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

[¶ 46.] *Americana*, upon which the majority relies, provides no factual support for its conclusion. In *Americana*, the son had direct control over all of the mother's finances and either had, or would have, ownership of all her assets that were not spent for the parent's care. In addition, son had legal guardianship over the mother and made all his mother's decisions as mother had Alzheimer's disease. Finally, and most importantly, son had an ongoing dispute (and thus

---

11. These transfers were done by deeds filed with the Clark and Day County Registers of Deeds on September 21, 1994. SDCL 43-28-15 states that the recording of an instrument such as a deed is constructive notice of the execution of that instrument to all purchasers or encumbrances subsequent to the recording.

12. In addition Dwight points out this tardy notice greatly increased his costs of discovery as he now had to gather information on the hospitalization via discovery in a legal action rather than being given notice contemporaneous to the hospitalization when he could conduct a first hand investigation.

notice of it) with the nursing home as to the fact his mother was in the home (he knew this because he put her there), that her bill was not being timely paid and that in some form the home was looking to him for payment as her son, guardian, or trustee as he had control over all his mother's assets. He had options and chose not to pay the bill and leave her in that home as a resident until her death.

[¶ 47.] Meaningful notice depends on the facts of the individual case. However, it must mean an opportunity, if reasonable, to be appraised that your parent is hospitalized and the hospital may be looking to you as the child for past, present and future bills for treatment. It must mean more than receiving notice years after the fact. If counties are entitled to reasonable notice that being fifteen days after admission, how can notice to an adult child be reasonable three years after the fact?