STATE OF MAINE

YORK, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-99-113

GAB - YOR - 10/30/2000

ANDREW CLARK,
KARIENA CLARK,

      Plaintiffs

v.

BROOKS WOOLEN, INC., MILL
INVESTMENTS, INC., AMES STEVENS, JR.,
RUTH STEVENS,

      Defendants

**DECISION AND ORDER**

DONALD L. GARBRECHT
LAW LIBRARY

NOV 2 2000

## BACKGROUND

This matter is before the court on cross motions for summary judgment.

On September 13, 1991, Andrew Clark was seriously injured in an elevator accident at Brooks Woolen Mill ("Brooks") in Sanford, Maine. At the time of the accident, Brooks was the lessor and owner of the mill and was required to insure the mill during the terms of the lease with the lessee, International Woolen Company (IWC). Brooks failed to procure insurance that would respond to the Clarks claims.[1] On October 19, 1994, Andrew Clark and his wife Kariena Clark obtained a judgment of $1.61 million against Brooks and F.S. Payne, the elevator maintenance company. (Exhibits S & T).[2] The Clarks were also awarded $220, 376.14 in prejudgment

---

[1] Ames Stevens argued that IWC, as lessee, was responsible for obtaining insurance. (File 1, Exhibit A p. 16).

[2] Apparently due to financial difficulties, Brooks at some point stopped defending the suit and a default judgment was entered against Brooks.

interest and an additional $17,906.08 in costs, totaling $238,282.22. (Exhibit U). Therefore, the total judgment in favor of the Clarks, including prejudgment interest and costs was $1,848,282.20. (Exhibit U). On May 10, 1995, F.S. Payne reached a settlement with the Clarks for $1,650,000. (Exhibit V). Accordingly, the Clarks allege that they have not collected $198,282.20 (plus interest accrued from October, 1994) of the total judgment.[3]

On June 8, 1993 Brooks sold its mill and other related manufacturing assets to International Woolen Company ("IWC") for $1.75 million. Ames Stevens was the principal owner of Brooks, holding approximately 70% of its stock. The corporate directors of Brooks were Ames Stevens, his wife Ruth Stevens and Charles Cabot, an attorney at Sullivan & Worcester in Boston. Ruth Stevens also owned a corporation called Mill Investments, Inc. ("MII"). All of the Plaintiffs' claims turn on the distribution of $1.75 million proceeds of the plant sale to IWC. That distribution consisted of $1.2 million to MII, $50,000 to Sullivan & Worcester and $500,000 to Ames Textile. Ames Textile is owned by Ames Stevens and his extended family[4]. No claims are asserted against Ames Textile or Sullivan & Worcester.

Beginning in 1987, Brooks began experiencing financial difficulties. In August of 1988, Brooks obtained a $500,000 loan from Ames Textile. This loan was

---

[3] Defendants dispute this figure and argue that Plaintiffs have failed to produce the complete closing documents.

[4] According to his Affidavit, Ames Stevens owns 60 shares of Ames Textile out of 24,556 outstanding shares held by extended family members or other interests. Ruth Ames owns no interest in Ames Textile.

2

guaranteed by both Brooks and Ames Stevens in his individual capacity. (Exhibit A, p.90, lines 1-14; Exhibit D). In November, 1988, Brooks leased the mill, with an option to purchase, to IWC. Within a relatively short period after Brooks and IWC entered the lease agreement, Brooks and IWC became involved in a series of lawsuits which the parties had filed against one another in federal and state courts in Maine and New York.

Starting in 1989, and continuing up to the time when Brooks discontinued its business operations in 1993, Brooks was not able to meet its financial obligations and had defaulted on its loans to the Bank of New England (BNE) and Maine National Bank (MNB). The Banks' loans were secured by: (1) all of the real estate, machinery and equipment, inventory, contracts and accounts receivable of Brooks; (2) a personal guarantee of Ames Stevens; and (3) a mortgage on the Stevens' personal residence. BNE and MNB had begun foreclosure proceedings against Brooks and its guarantors.

In the spring of 1991, Ames Stevens and Brooks' attorneys at Sullivan & Worcester engaged in negotiations with the bank and proposed an acquisition of the Banks' notes by a "third-party" corporation. Ruth Stevens did not participate in these negotiations. (Exhibit B, p. 50-51, lines 7-6, Exhibit E). MII was formed in April of 1991 as a Maine corporation by Ruth Stevens, who was the sole shareholder. MII was incorporated to serve as a vehicle for acquisition of the Banks' notes. (Exhibit A

p. 67-68, lines 11-18).    MII was initially capitalized with $1.250 million dollars of Ruth Stevens' personal funds.  On May 3, 1991, MII purchased the loans and security positions of BNE and MNB for $1.2 million.[5]  The security positions included all the assets and real property of Brooks, including any proceeds thereof.  In an affidavit, Ruth Stevens states that the creation of MII and its acquisition of the secured loans was to help her husband and his business and to avoid a financial collapse, including the loss of their home. (File 1, tab 8, ¶ 8 & 9).  After the loans of MNB and BNE were acquired by MII, MII was substituted as party plaintiff in the foreclosure action commenced by MNB and BNE.

In June, 1993, IWC and Brooks reached a global settlement resolving their various disputes.  As part of the settlement, IWC paid Brooks $1.75 million for the mill.  Of these sale proceeds, Brooks made a payment of $500,000 to Ames Textile and $50,000 to Sullivan and Worcester.  Ames Stevens directed the remaining $1.2 million of the sale proceeds to Ruth Stevens' personal account. (Exhibit B, p. 109, lines 17-21, p. 110, lines 14-21, p. 112, lines 12-22, Exhibit A, pages 98-99, lines 23-2).[6] Sometime after Brooks transferred the $1.2 million to Ruth Stevens' personal account, the account was converted to a joint account that was co-owned by Ames and Ruth Stevens. (Exhibit A, p. 123-24, lines 14-1, Exhibit B, p. 31-32, lines 23-17).

---

[5]According to Ames Stevens, he and his wife never considered acquiring the Banks' notes in their individual capacities because they feared that they would never be able to recover their money due to ongoing litigation with IWC.  See exhibit B, page 98, lines 4-12.

[6]The account in question had previously been used to pay:
(a) $622,260.90 to the IRS in 1991. (Exhibit A, p. 79-82, lines 13-20, p. 103, lines 7-11);
(b) the legal fees of Murray, Plumb& Murray (Brooks' attorneys in connection with the Clarks' action)(Exhibit A, p. 103, lines 12-14; Exhibit J).
(c)Ames Stevens (Exhibit A, p. 86, lines 10-18, p. 103, line 15-17; Exhibit J)
(d) Ruth Stevens, for personal use (Exhibit A, p. 103-04, lines 21-1)

4

## COUNT I & II: FRAUDULENT TRANSFER

In Count I Plaintiffs' allege that "the transfer of Brooks Woolen mill to International Woolen in compliance with the settlement agreement between the two entities constitutes a voidable fraudulent transfer of Defendants' property under 14 M.R.S.A. § 3571 et seq." It is alleged that Defendants received less than reasonable equivalent value in exchange for the mill to IWC and that the transfer was made at a time when Brooks was insolvent and that the transfer was therefore fraudulent as to creditors, including Plaintiffs, whose claim arose prior to the date of transfer and was intended to hinder, delay or defraud Plaintiffs as defined by 14 M.R.S.A. § 3575(2).

In Count II, Plaintiffs allege that Ruth Stevens is an insider of Brooks and that the transfer of funds from Brooks to Ruth Stevens individually for the mortgages acquired by MII was a transfer to an insider under 14 M.R.S.A. §3576(2). It is alleged that this transfer was made while Brooks was insolvent and that subsequent to Ruth Stevens' receipt of funds from Brooks she directed MII to discharge the mortgage without having received the benefit of reasonable equivalent value. Count II concludes that the transfer of the sale proceeds received by Brooks to Ruth Stevens individually constitutes a voidable fraudulent transfer under 14 M.R.S.A. §3576(2).

## COUNT III: NEGLIGENCE

Count III alleges that "Defendants owed a duty of care to Plaintiffs to act in a manner which a reasonably prudent business entity would act in the management

5

of its affairs, assets and officers." It is alleged that Defendants breached this duty by failing to maintain insurance, failing to maintain sufficient assets, failing to account for assets and transactions and improperly distributing assets and property and commingling personal and corporate assets and seizing corporate opportunities.

## COUNT IV & V:   PIERCING THE CORPORATE VEIL

Count IV alleges that Brooks Woolen was an alter ego of Ames and Ruth Stevens and therefore transfers made by Brooks Woolen should be treated as transfers by Ames and Ruth Stevens.   It is alleged that the transfer of Brooks Woolen to IWC and the subsequent transfer of sale proceeds from Brooks to MII was fraudulent, lacked sufficient documentation, thinned corporate assets and resulted in an unjust and inequitable consequence in regard to Plaintiffs.

Count V alleges that MII was an alter ego of Ruth Stevens, such that transfers received by MII should be treated as transfers received by Ruth Stevens. It is further alleged that the transfer of the sale proceeds to MII was fraudulent, commingled assets, lacked sufficient documentation, thinned the corporate assets and resulted in an unjust and inequitable consequence in regard to Plaintiffs.

## COUNT VI:   BREACH OF FIDUCIARY DUTIES

Count VI alleges that Defendants owed a fiduciary duty of good faith and loyalty and a duty of care to its creditors, including Plaintiffs.   It is alleged that Defendants breached their fiduciary duties to Plaintiffs by failing to maintain and properly manage corporate assets; failing to provide accounting to the corporation; transferring the assets of the corporation; negligently disbursing assets of the corporation; and causing the corporation to become undercapitalized.

6

## COUNT VII:   UNJUST ENRICHMENT

Count VII alleges that Brooks did not receive a reasonable equivalent value for the transfer of the mill to IWC as proceeds were diverted to MII without good and valid consideration.   It is alleged that the transfer of funds from Brooks to MII was made under such circumstances as to make it inequitable for MII to retain the benefit of the transfer.

## DISCUSSION

### The Transfer of $1.2 million from Brooks to MII

The purpose of the Uniform Fraudulent Transfer Act (UFTA) is to prevent the depletion of a debtor's estate to the detriment of unsecured creditors. Fleming Companies, Inc. v. Rich, 978 F. Supp. 1281, 1294 (E.D. Mo. 1997).   It provides unsecured creditors with a means of relief in the event the debtor engages in transactions designed to conceal assets or place them beyond the reach of the unsecured creditors seeking to satisfy their claims. Id.

For the purpose of this case, the UFTA contains two sections under which an unsecured creditor may pursue fraudulent transfer of assets, 14 M.R.S.A. § 3575 and § 3576:

14 M.R.S.A. § 3575

(1) Fraudulent Transfer.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

7

(A) With actual intent to hinder, delay or defraud any creditor of the debtor.

14 M.R.S.A. § 3576

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

For two reasons, the Clarks cannot recover under 14 M.R.S.A. § 3575. First, the plain language of the UFTA precludes recovery against MII under the UFTA. The term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with an *asset or an interest in an asset* ... ." 14 M.R.S.A. § 3572(12). However, the term "asset" *does not include* "property to the extent that it is encumbered by a valid lien." 14 M.R.S.A. § 3572(2)(A). MNB and BNE unquestionably held a valid security interest in all Brooks assets. MII was formed in April in 1991 and acquired the banks' loans and security positions in May 1991. Because MII adopted a fully secured position, the receipt of closing proceeds for the release of the security does not involve the

8

transfer of "assets" within the contemplation of UFTA. See also Rich v. Rich, 405 S.E.2d 858, 861 (W. Va. 1991)(finding that the portion of property that was encumbered by a lien was not an "asset" subject to fraudulent transfer under the UFTA); Eagle Pacific Insurance Company v. Christensen Motor Yacht Corporation, 959 P.2d 1052, 1060-61 (Wash. 1998)(stating that if a debtor transfers assets encumbered by security interests, that transfer is beyond the reach of the UFTA).

Second, under 14 M.R.S.A. § 3575 the debtor's state of mind becomes the point of inquiry. 14 M.R.S.A. § 3575(2) identifies some factors whose presence or absence may indicate whether a transfer was made with actual intent to hinder, delay or defraud creditors. The timing of the transactions in question belie the notion that the transfer of $1.2 million was effected with fraudulent intent in relation to the Clarks. As noted above MII acquired the banks' loans and security positions in May 1991. Andrew Clark was injured at the mill in September 1991. The creation of MII and the acquisition of the banks' loans were therefore accomplished before Clark even became a potential creditor. The subsequent transfer of $1.2 million to MII in June of 1993 served to discharge the obligation that was acquired before Clark was injured.

The Clarks argue in the alternative, that if the corporate veil is pierced, Ruth Stevens qualifies as an insider of Brooks and therefore strictly liable under 14 M.R.S.A. § 3576(2). The Clarks cite Prairie Lakes Health Care System v. Wookey, 583 N.W.2d 405 (S.D. 1998) for the proposition that if the individual elements of the UFTA's transfer to insider provision are literally satisfied, a fraudulent transfer is

established conclusively, regardless of the actual intent of the parties and whether or not reasonable equivalent value was given. In <u>Wookey</u>, a patient and his wife deeded all their real estate to their adult son. However, it was agreed that the parents would be allowed to live in the home rent-free for the rest of their lives. The court found that the property transferred was worth $332,560 and that the consideration included $148,360 on the assumption of the mortgage, $149,000 for payments on an antecedent debt and $58,000 in the form of a promissory note. <u>Id.</u> at 409. The plaintiff-hospital, attempting to collect substantial bills incurred by the father, sought to void the transfer as fraudulent. The Supreme Court of South Dakota remarked that <u>Wookey</u> exemplifies the archetypal fraudulent transfer - virtually all an insolvent debtor's property transferred to a family member thus defeating a creditor's imminent judgment while the debtor continues to reside on the property.

The reliance on <u>Wookey</u> and the argument that Ruth Stevens is an insider must fail for the reasons set forth above. Assuming, but not deciding that the corporate veil could be pierced, thereby reaching Ruth and Ames Stevens (who became a joint owner of the bank account after the transfer and therefore qualifies as a subsequent transferee under 14 M.R.S.A. § 3579(2)(A) and (B)), the transfer of $1.2 million remains outside the scope of the UFTA because Ruth Stevens occupied the position of a valid secured lien holder, and the transfer of $1.2 million discharged this interest.

10

The $500,000 payment to Ames Textile

It is not disputed that in August of 1988, Ames Textile loaned Brooks $500,000. This loan was guaranteed by Brooks and by Ames Stevens personally and was repaid in June 1993. The Clarks obtained a judgment against Brooks in October 1994. Debtors may generally prefer one creditor over another in applying assets to discharge their obligations. 37 Am Jur. 2d. § 87. The Clarks, however, cite Mitsubishi Caterpillar Forklift America, Inc. v. Superior Service Associates, Inc., 81 F. Supp.2d 101, 115 (D. Me. 1999) for the proposition that a corporation's directors owe a fiduciary duty to the corporation's creditors after the corporation becomes insolvent. In Mitsubishi, Superior Service Associates (SSA) was an authorized dealer for Mitsubishi Caterpillar Forklift America (MCFA). Defendant Burkert was the president of SSA. SSA executed and delivered to MCFA a security agreement which MCFA perfected. SSA also executed various promissory notes to MCFA. MCFA and Associates Commercial Corporation (ACC), another secured creditor of SSA entered into an Intercreditor Agreement that established the relative priorities of their security interests in all the assets of SSA. MCFA had a first priority interest in trucks and parts sold by MCFA to SSA for which they had not been paid and the proceeds of the sale of any such truck or parts. ACC had a first priority interest in the remainder of SSA's assets. Approximately three years later, SSA, ACC and Burkert executed a Voluntary Surrender Agreement and Release pursuant to which SSA surrendered all its assets to ACC. In so doing, SSA diverted funds from the sales of MCFA's secured collateral to ACC. The debt to ACC had been personally guaranteed by Burkert.

11

In the present case, a corporate debt obligation for which Ames Stevens was personally liable was discharged. However, that is where the analogy to <u>Mitsubishi</u> ends. Both the Ames Textile debt and the Clarks' judgment were unsecured and therefore on equal footing. Moreover, the Clarks' claim did not ripen until September 1994, fifteen months after the debt to Ames Textile had been discharged. Brooks was therefore entitled to discharge the debt to Ames Textile.

The entry will be as follows:

Upon Motion of the Defendants herein pursuant to Rule 56 of the Maine Rules of Civil Procedure, after notice and an opportunity to be heard, there being no genuine issue of fact and it appearing the Defendants are entitled to Summary Judgment as a matter of law, Summary Judgment is hereby entered in favor of all Defendants on all claims asserted by Plaintiffs.

The clerk may incorporate this order in the docket by reference.

Dated:  October 30, 2000

G. Arthur Brennan
Justice, Superior Court

H. J. Friedman, Esq. - PLS
U. C. Remmel, II, Esq. - DEFS - BROOKS WOOLEN CO., INC. & MILL INVESTMENTS, INC.
P. D. Detroy, Esq. - DEFS - AMES STEVENS, JR. & RUTH STEVENS

12