1996 SD 117

**Marilyn L. SHEDD and L. James Shedd, Plaintiffs and Appellants,**

v.

**Larry A. LAMB and Gold Coin, Inc., Defendants and Appellants.**

**Larry A. LAMB, Plaintiff and Appellant,**

v.

**Marilyn L. SHEDD, Defendant and Appellant.**

Nos. 19215, 19222.

Supreme Court of South Dakota.

Considered on Briefs May 23, 1996.

Decided Sept. 4, 1996.

Rehearing Denied Oct. 10, 1996.

Thomas E. Brady, Spearfish, for defendants and appellants Shedd.

James P. Hurley of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for defendants and appellants Lamb and Gold Coin, Inc.

AMUNDSON, Justice.

[¶ 1] Marilyn L. Shedd and L. James Shedd (Shedds) appeal the trial court's determination that they must pay Larry A. Lamb (Lamb) $300,000 to equitably adjust the parties' dispute. Lamb appeals the trial court's order of rescission. We reverse and remand the order granting rescission.

## FACTS AND PROCEDURAL HISTORY

[¶ 2] Shedds have owned and operated Shedd Jewelry in Deadwood since 1975. At the time this cause of action came to fruition, the jewelry business was delinquent on bills owed to jewelry suppliers in the amount of $330,000. In addition, Shedds had personal financial difficulty. From 1985 to 1990, Shedds filed estimates as to their federal tax liability; however, they failed to file their federal income tax returns. Their total delinquent tax bill accumulated to $140,000.

[¶ 3] In 1990, when gambling was established in Deadwood, Shedds decided to apply for a gaming license. The South Dakota Gaming Commission told Shedds to file their past-due federal tax returns and pay the taxes before a gaming license would be issued. Shedds therefore attempted to mortgage the jewelry business to obtain funds to pay off the debts, but they were turned down by both banks to which they applied.

[¶ 4] Lamb arrived in Deadwood in 1990. He purchased a home and commercial property which he desired to develop into a restaurant, casino and hotel in Deadwood for $1,300,000 ($325,000 paid in cash and the remainder carried on a promissory note). Lamb's only source of income at the time was a promissory note he owned for five RV parks he had sold. Lamb received $100,000 cash and a $400,000 promissory note with ten-percent interest to be paid over ten years. Later, the principal was reduced to $327,000 and the interest increased to fifteen percent. Lamb received monthly payments of $5,300, totaling $636,000 to be paid over ten years.

[¶ 5] Lamb and Shedds met in 1990 and soon thereafter Shedds became aware that Lamb was looking for funds to develop his Deadwood gaming property. On March 20, 1991, Shedd telephoned Lamb in California, where Lamb was in search of new investment capital, requesting Lamb to assist them in locating funds to pay off the IRS. There were numerous phone calls between the two parties over the next several days regarding the availability of funds to pay off the debts and to underwrite Shedds' gaming venture. During discussions, Lamb expressed interest in purchasing the Shedd jewelry business and building. However, Lamb said he did not have enough capital on hand. Lamb considered discounting the promissory note on the RV business to $250,000 cash in order to raise the money, but his monthly income of $5,300 would be lost.

[¶ 6] After further discussion, they eventually agreed that Lamb would discount his secured note to pay Shedds $200,000 in exchange for clear title to the Shedd jewelry building. Discussion of the agreement included: Shedds would use the $200,000 to pay the IRS so that they could obtain a gaming license; Lamb would mortgage the jewelry building, to finance another unrelated project; Lamb would pay Shedds an additional $100,000 when he obtained more financing; the jewelry business would be sold to Lamb for $1,000,000; the purchase price would be paid on the closing date which was set for 180 days after the agreements were entered into as long as outside financing could be established; if Lamb was unable to receive outside financing, Shedds agreed to

finance the sale by allowing Lamb to pay monthly installments of $8,364 over a ten-year period; Shedds represented that the business grossed about $1,000,000 the previous year and that they owned $300,000 in jewelry inventory; Shedds stated that the business netted between $240,000 to $250,000 per year, or about $20,000 per month; and Shedds agreed to lease the jewelry building back for $20,000 per month until the sale closed. (This lease payment was based on what Shedds represented the business would net.)

[¶ 7] When Lamb returned from California, he retained an attorney to draft agreements that described the parties' negotiations. Shedds had not consulted an attorney at this time. On April 11, 1991, the parties met at Lamb's Rapid City attorney's office to sign the agreements, which were three written contracts and the deed. One contract contained a $200,000 cash sale of the Shedd jewelry building to Lamb. A separate contract for $1,000,000 sold the actual jewelry business to Gold Coin, Inc., a corporation that was later incorporated by Lamb. The $1,000,000 purchase price consisted of $300,000 for inventory, $30,000 in furniture and equipment, $220,000 in goodwill and $450,000 for a covenant not to compete. The third contract was a lease of the building to Shedds for $20,000 per month for three and one-half years, which both parties understood would terminate upon closing of the sale of the jewelry business in 180 days. This understanding was not included in the contract.

[¶ 8] After reviewing the prepared documents for the first time, Shedds signed the documents within one hour on that same day. Lamb arranged to pay Shedds the $200,000 purchase price of the building on April 16, 1991. Lamb further agreed to pay Shedds an additional $100,000 for the building, which was not covered in the agreements. The reason the building was sold at a discounted rate was to allow Lamb to purchase it outright so that he could use it to secure financing on his projects. Shedds then deeded Lamb the building.

[¶ 9] On April 15, 1991, Shedds consulted an attorney who read the agreements and warned Shedds it was the worst deal he had ever seen. Also, the attorney advised Shedds that the agreements were binding, but could be rescinded. Shedds were instructed by their attorney not to sign any more documents regarding these transactions without his prior approval.

[¶ 10] Notwithstanding this advice, on April 16, 1991, Shedds signed a revised purchase agreement and accepted $140,000 in cash and a $60,000 promissory note on the sale of the building. On April 22, 1991, Shedds were able to pay off their tax debts with the $140,000. After making this payment, Shedds were able to reapply to the Gaming Commission for a gaming license.

[¶ 11] On April 19 and May 29, 1991, Shedds' attorney again advised them of their right to rescind. Lamb recorded the deed on May 17, 1991. Meanwhile, Shedds' attorney began negotiating with Lamb's attorney in an attempt to modify the signed agreements. Although some changes resulted, the agreements remained basically the same as the originals.

[¶ 12] Under the agreement, October 1991 was to be the closing date for the sale of the jewelry business. However, the closing did not occur because Lamb alleged that Shedds did not disclose to him that the debt on the $300,000 in inventory was unpaid. The agreement stated that if there was less than $300,000 in inventory, the sale price would be discounted accordingly. There was no provision to increase the sale price if the inventory was more than $300,000. Eventually, Lamb agreed to secure the jewelry business purchase price with a lien on the inventory, furniture, fixtures, and equipment.

[¶ 13] Shedds made lease payments of $115,000 to Lamb from May until October 1991. After the closing date passed, Shedds ceased paying rent. Shedds admitted at trial that the representation made to Lamb that the business would yield $240,000 to $250,000 per year was grossly inflated. Ultimately, the parties agreed to extend the closing date until November 1, 1991.

[¶ 14] Lamb leased another property on June 9, 1992, for $400 per month to set up a casino. He subleased this property to

Shedds for $5,000 per month on the same date. The goal was to open the Gold Coin Casino on this property and use its profits to aid in the restoration of the jewelry property. Since Lamb did not possess a gaming license, he needed Shedds' license which had been obtained after paying off their IRS debt. Lamb encountered difficulty in financing the projects which included the jewelry business purchase, the gaming venture, and the restoration of the original project. He continued to seek other financing after the closing date passed.

[¶ 15] On August 4, 1993, over two years after the signing of the agreements, Lamb and Shedds met with Howard Owens (Owens). Owens loaned Lamb $300,000 in exchange for a first mortgage on the jewelry building. The $300,000 was paid to Lamb through Gold Coin, Inc. and Black Hills Gold, Inc., two corporations which Lamb had incorporated and for which he had not issued stock. Shedds received $130,000 of the $300,000. Shedds used $100,000 to pay off two outstanding $50,000 checks to creditors and used the other $30,000 to pay the state tax for fifteen gaming machines at the Gold Coin Casino. Lamb states that the $100,000 was to satisfy the extra $100,000 that he had orally promised to pay Shedds. Shedds assert they were led to believe that they would receive all of the $300,000.

[¶ 16] Before Lamb paid Shedds the $100,000, Shedds promised that they would close on the jewelry business sale. However, Shedds did not close after receiving the money. Two and one-half years after signing the contracts, Shedds sought rescission of the agreements.* Lamb counterclaimed, seeking specific performance. The trial court bifurcated the legal issues from the equitable issues. At this time, the legal issues remain pending. The trial court granted rescission on April 19, 1995, holding that the matter was timely presented. Since the agreements were rescinded, the trial court ordered Shedds to pay Lamb $300,000 through equitable adjustment. Shedds appealed, arguing that the trial court did not make an equitable

adjustment. Shortly thereafter Lamb appealed, asserting the trial court erred when it granted rescission, to which we agree.

## ANALYSIS

[¶ 17] A trial court's findings of fact will not be disturbed unless they are clearly erroneous. *Jasper v. Smith,* 540 N.W.2d 399, 401 (S.D.1995); *see also Knudsen v. Jensen,* 521 N.W.2d 415, 418 (S.D.1994). Under this standard, we will not disturb the trial court's findings unless, after a review of all the evidence, we are firmly and definitely convinced a mistake has been made. *Cordell v. Codington County,* 526 N.W.2d 115, 116 (S.D.1994). We review conclusions of law under a *de novo* standard. *Id.* Under this standard, we give no deference to the trial court's conclusions of law. *Id.*

[¶ 18] The trial court granted rescission of the signed contracts, stating that Shedds' consent was obtained through fraud, undue influence, and mistake. A valid contract requires free and mutual consent. SDCL 53-3-1. Consent is not real or free if obtained through fraud, undue influence, or mistake. SDCL 53-4-1. "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting." SDCL 53-3-5.

[¶ 19] Rescission of a contract is available if the consent of the party seeking rescission was obtained by mistake, duress, fraud, or undue influence. SDCL 53-11-2(1) and (2). A contract voidable for want of consent may, however, be ratified by subsequent consent. SDCL 53-3-4. Equitable relief of rescission should not be granted unless the evidence is clear and convincing. *Vermilyea v. BDL Enterprises, Inc.,* 462 N.W.2d 885, 888 (S.D.1990).

[¶ 20] Even if consent is obtained through fraud, undue influence or mistake, the victim may ratify the contract by his or her actions. *See* SDCL 53-3-4. Failure of a party to disaffirm a contract over a period of

---

* Since Shedd's attorney was going to be a witness at the rescission trial, they retained another attorney who is also representing them on appeal.

time may ripen into ratification, especially if rescission will result in prejudice to the other party. *First State Bank of Sinai v. Hyland,* 399 N.W.2d 894, 898 (S.D.1987).

[¶ 21] The party seeking rescission must do so promptly upon discovery of the facts which entitle them to rescind. SDCL 53–11–4. The question of whether a rescinding party acted promptly is a question of law. *Knudsen,* 521 N.W.2d at 420 (citations omitted); *see also Nielsen v. McCabe,* 442 N.W.2d 477, 481 (S.D.1989). A trial court's decision is presumed correct, and we will not seek reasons to reverse. *Insurance Agents, Inc. v. Zimmerman,* 381 N.W.2d 218, 219 (S.D.1986) (citations omitted).

[¶ 22] Shedds knew they could rescind as early as April 15, 1991. Shedds' attorney reminded them of this right on several occasions. Yet, Shedds voluntarily accepted $330,000 in cash from Lamb. Shedds paid off the IRS, obtained a gaming license, and paid other creditors with this money. Not until September 1993 did Shedds seek to rescind the agreements.

[¶ 23] Since we look to the facts and circumstances of each case, other decisions are not controlling; however, they offer us guidance. In *Knudsen,* we held that the purchaser of a home did not act promptly when it waited two and one-half years to rescind. 521 N.W.2d at 420. When a party continues in compliance with the terms and conditions of an agreement (like paying rent) and does not rescind for two years, we have held the party waives the right to rescind. *Kane v. Schnitzler,* 376 N.W.2d 337, 339 (S.D.1985). Shedds received substantial payments from Lamb over the course of their two and one-half year relationship with Lamb. Further, Shedds represented to a prospective lender (Owens) that they had full faith in Lamb's ability to operate the ventures two years after the agreements were made. Based on these facts and circumstances, along with Shedds' knowledge of the right to rescind for two and one-half years, we reverse the trial court's finding that the action for rescission was timely brought.

[¶ 24] Further, we must determine "whether the delay was long enough to prej-udice the other party." *Knudsen,* 521 N.W.2d at 420 (citing *Kane,* 376 N.W.2d at 340). Lamb relied on the fact that he owned the building when making his business plans. Lamb also depended on Shedds closing after they received the $130,000 from the loan by Owens. However, Shedds refused to close after receiving the money. This set of facts shows Lamb was prejudiced.

[¶ 25] Shedds, on the other hand, were able to pay off their debts and avoid criminal prosecution. Furthermore, Shedds sat on their right to rescind for two and one-half years after being advised of this right by their counsel. During this period of time, Shedds retained the jewelry business, which was prospering at this time, retained all proceeds from the jewelry business, made no lease payments after November 1991, and lived rent free in the upstairs apartment of the jewelry business. In addition, Shedds continued to assist Lamb in obtaining financing so they could close the deal. It is clear under these circumstances that the parties used joint efforts to continue finalizing the transaction.

[¶ 26] When parties seek equity in the court, they must do equity, which includes entering the court with clean hands. *Kane,* 376 N.W.2d at 341 (citations omitted). "A [person] who does not come into equity with clean hands is not entitled to any relief herein, but should be left in the position in which the court finds him." *Id.* (citations and quotations omitted). Based on these facts, this case certainly does not cry out for the equitable relief of rescission.

[¶ 27] Since rescission was improper, we do not reach Shedds' issue of equitable adjustment. We reverse and remand for a determination of the legal issues including breach of the lease agreement and breach of the purchase agreement.

[¶ 28] MILLER, C.J., and SABERS, KONENKAMP, and GILBERTSON, JJ., concur.