#24163-rev-KEAN, Retired Circuit Judge
**2007 SD 98**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GLIMCHER SUPERMALL VENTURE,
LLC, a Delaware corporation,                    Plaintiff and Appellant,

        v.

COLEMAN COMPANY and
DWIGHT SOBCZAK, SR.,                          Defendants and Appellees,

DWIGHT SOBCZAK, JR., DAN SOBCZAK,
and DUANE SOBCZAK,                            Defendants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA
\* \* \* \*

HONORABLE MERTON B. TICE, Jr.
Judge

\* \* \* \*

HAVEN L. STUCK and
JANE WIPF PFEIFLE of
Lynn, Jackson, Shultz & Lebrun          Attorneys for plaintiff
Rapid City, South Dakota                and appellant.

TED L. McBRIDE and
LARRY M. VON WALD of
Beardsley, Jensen & Von Wald, LLC       Attorneys for defendants
Rapid City, South Dakota                and appellees.

\* \* \* \*

ARGUED
JANUARY 9, 2007

OPINION FILED 9/19/07

#24163

KEAN, Retired Circuit Judge

[¶1.]     Glimcher SuperMall Venture, LLC (Glimcher) brought this action in Pennington County, South Dakota under the Uniform Fraudulent Transfer Act (UFTA), claiming that the transfer of substantially all of the assets of Black Hills Gold Factory Outlet Store, Inc. (BHG) to Coleman Company (Coleman) and Dwight Sobczak (Sobczak) was a prohibited fraudulent transfer.

FACTS AND PROCEDURE

[¶2.]     In 1994 Washington SuperMall Interests, L.P. (Washington SuperMall) began the process of developing a shopping mall in Auburn, Washington, a suburb of Seattle. Washington SuperMall contacted Coleman about the prospect of Coleman opening a retail store in the mall which would sell Black Hills Gold jewelry. Coleman is a closely-held South Dakota corporation which manufactures and distributes Black Hills Gold jewelry throughout the United States and also internationally. Its corporate offices are located in Rapid City, South Dakota. Defendants Dwight Sobczak, Sr., Dwight Sobczak, Jr., Dan Sobczak, and Duane Sobczak are family members, shareholders, officers and employees of Coleman.[1]

[¶3.]     Coleman was concerned about the liability exposure of such a venture in a new mall. Instead, BHG was formed as a new and distinct Washington corporation to operate the gift store within the mall. BHG would then sell Black Hills Gold jewelry manufactured and sold to it by Coleman. Coleman had

---

1.     All of the individual defendants, except Dwight Sobczak, Sr. (Sobczak), were dismissed prior to the court trial. Coleman Company and Dwight Sobczak will be referred to collectively unless noted.

significant control over BHG as the two corporations had nearly identical shareholders, directors and officers, along with the ownership interests. Coleman managed and supervised BHG's financial affairs through a common retail store manager and was paid a management fee. The corporate offices of both businesses were located at the same address in Rapid City.

[¶4.] In July 1994 BHG entered into a lease agreement with Washington SuperMall to begin July 15, 1995 and expiring August 31, 2002. Sobczak signed the lease as president of BHG. Because BHG was a newly formed corporation, Washington SuperMall sought and received from Coleman a one year rent guarantee. Sobczak signed the guarantee on behalf of Coleman as its president. Sometime later, Glimcher purchased all of Washington SuperMall's interests in the mall and became the owner of BHG's lease.

[¶5.] BHG operated the retail gift store until January 2001 when it closed the store and vacated the mall. At the time BHG vacated the premises, it had nineteen months remaining on the lease. BHG paid rent for January 2001, but failed to pay for the remaining months. In December 2000 BHG paid off $34,000 in shareholder loans to BHG. When BHG closed its store, all creditors, except for Glimcher and Coleman, were paid. In January 2001 BHG transferred $45,000 from its bank in Washington to Coleman's account in Rapid City and also transferred approximately $225,800 in inventory to Coleman. Later the store equipment was sold and the proceeds also paid to Coleman. The equipment, inventory and cash of BHG were not subject to any security interests. Coleman claims the transfers were

made in return for cancellation of an account in excess of $600,000 owed by BHG to Coleman for unpaid inventory. These transfers reduced the assets of BHG to almost nothing. BHG was administratively dissolved by the State of Washington on April 23, 2001.

[¶6.]     Glimcher sued BHG in Washington state court for the balance due under the lease. BHG and Glimcher reached a stipulation that judgment be entered against BHG in the amount of $90,000, plus 12 percent interest. The judgment was filed December 17, 2003 in the Superior Court of King County, Washington.

[¶7.]     Glimcher entered its Washington judgment against BHG as a foreign judgment in Pennington County, South Dakota on March 3, 2004. After the judgment remained unsatisfied, Glimcher initiated this action under the UFTA in January 2005. After a trial to the court on January 10, 2006, the trial court issued a memorandum opinion dated April 25, 2006, followed by findings of fact and conclusions of law incorporating the memorandum opinion. The trial court concluded that there was neither actual fraud nor constructive fraud to hinder, delay or defraud creditors. It further concluded that reasonable equivalent value was given by Coleman in exchange for the transfer of inventory and cash. Therefore, it found that the transfer was not fraudulent under the UFTA. Glimcher appeals. Finding error, we reverse.

## STANDARD OF REVIEW

[¶8.]     "In reviewing a judge's findings in a court trial, we give no deference to conclusions of law; thus we review them under the de novo standard." Prairie Lakes Health Care Sys., Inc. v. Wookey, 1998 SD 99, ¶5, 583 NW2d 405, 410 (citing

S.B. Partnership v. Gogue, 1997 SD 41, ¶8, 562 NW2d 754, 756 (citing Central Monitoring Serv., Inc. v. Zakinski, 1996 SD 116, ¶17, 553 NW2d 513, 517)). "Conversely, we examine findings of fact under the more deferential clearly erroneous standard." *Prairie Lakes Health Care Sys.*, 1998 SD 99 at ¶5, 583 NW2d at 410 (citing *Gogue,* 1997 SD 41, ¶8, 562 NW2d at 756 (citing Shedd v. Lamb, 1996 SD 117, ¶17, 553 NW2d 241, 244)). This Court will not overturn fact findings "'unless we are definitely and firmly convinced a mistake has been made.'" *Prairie Lakes Health Care Sys.*, 1998 SD 99 at ¶5, 583 NW2d at 410 (quoting Cordell v. Codington Cty., 526 NW2d 115, 116 (SD 1994)).

ANALYSIS AND DECISION

ISSUE ONE

The Uniform Fraudulent Transfer Act

[¶9.]    The parties agree that this matter should be decided under Washington law. Butler Machinery Co. v. Morris Const. Co., 2004 SD 81, ¶¶6-7, 682 NW2d 773, 776-77. Both Washington and South Dakota adopted the UFTA in 1987. WashRevCodeAnn (RCWA) ch 19.40; SDCL ch 54-8A. The purpose of the UFTA is to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. UFTA §3, cmt (2). "The Act invalidates 'otherwise sanctioned transactions made with a fraudulent intent.'" *Prairie Lakes Health Care Sys.*, 1998 SD 99 at ¶6, 583 NW2d at 410. Because RCWA 19.40.903 provides that "[t]his chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states

enacting it[,]" case law from other jurisdictions can provide guidance in interpreting the UFTA. Sedwick v. Gwinn, 873 P2d 528, 532 n8 (WashCtApp 1994).

### A. Actual Fraudulent Intent

[¶10.] The UFTA analyzes transfers as actually fraudulent or constructively fraudulent. RCWA 19.40.041(a)(1) provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

[¶11.] RCWA 19.40.041(b) lists objective factors which may be considered in deciding whether a transfer was made with actual intent to hinder, delay or defraud a creditor:

> (b) In determining actual intent under subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;
>
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;
>
> (6) The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and,

(11)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[¶12.]     These factors have been referred to as "badges of fraud." *See* UFTA §4, cmt (5). "Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation." *Id.* The debtor's state of mind becomes the point of inquiry when considering whether a transfer was actually fraudulent. *Prairie Lakes Health Care Sys.,* 1998 SD 99 at ¶7, 583 NW2d at 411. The debtor[2] in this case was BHG, not Coleman. Glimcher and Coleman were creditors[3] with claims.[4] While the ownership interests and corporate officers and directors are the same for both

---

2.     "'Debtor' means a person who is liable on a claim." RCWA 19.40.011(6).

3.     "'Creditor' means a person who has a claim." RCWA 19.40.011(4).

4.     "'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." RCWA 19.04.011(3).

Coleman and BHG, BHG, as a Washington corporation, was a separate entity, a distinction not fully appreciated by the trial court. The trial court focused on the actions of Coleman and determined that "Coleman acted without fraud or the intention to defraud anyone, and went beyond that which would have been otherwise expected of them." However, this transfer must be evaluated from the perspective of the debtor, BHG. The trial court's error was compounded when it only considered some of the badges of fraud while overlooking others. Further problems arose in the conclusions reached when those badges of fraud were actually considered. This requires a review of RCWA 19.40.041(b).

a. *Transfer to an insider.* RCWA 19.40.041(b)(1).

[¶13.] The trial court found that the transfer of BHG's assets to Coleman was to an insider[5] as the shareholders, officers and directors of both corporations are nearly identical.

> The fact that a transfer has been made to a relative or to an affiliated corporation has not been regarded as a badge of fraud sufficient to warrant avoidance when unaccompanied by any other evidence of fraud. The courts have uniformly recognized, however, that a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged.

UFTA §4, cmt (5). Close scrutiny of the facts indicates that when BHG transferred these assets, it was the Coleman owners acting as BHG owners who made the decision.

---

5.  The definition of an "insider" when the debtor is a corporation includes directors, officers and persons in control of the debtor. RCWA 19.04.011(7)(ii).

b. *The transfer was disclosed or concealed.* RCWA 19.40.041(b)(3).

[¶14.] None of the transfers were disclosed. Even though Glimcher may have noticed that BHG locked its doors at the mall, there was no indication that Glimcher had any knowledge that BHG's assets were being moved from Washington to South Dakota. The same can be said of the proceeds from the sale of store equipment and the payoff of the stockholder loans in December 2000. Actually, Glimcher could certainly have concluded otherwise when BHG sent the January 2001 lease payment after Glimcher sent a letter concerning the remaining lease obligation.

c. *Before the transfer was made, the debtor had been sued*
*or threatened with suit.* RCWA 19.40.041(b)(4).

[¶15.] When BHG did not pay the January 2001 rent and occupancy charges, Glimcher's legal counsel sent a letter on January 15, 2001, reminding BHG of its lease obligations. In part the letter stated: "Failure to remit payment within ten (10) days . . . shall result in the initiation of all remedies available for collection of this debt including but not limited to a suit for eviction and money judgment." The trial court stated that, "there were no suits pending." This badge of fraud does not require actual litigation, only the threat of litigation. The letter was the threat of litigation. That was an error by the trial court.

d. *The transfer was of substantially all of the debtor's assets.*
RCWA 19.40.041(b)(5).

[¶16.] The trial court wrote: "The transaction resulted in there being no assets whatsoever in the hands of BHG." The court further wrote: "Coleman removed all the inventory and equipment; zeroed out the books." Yet, having found

this badge of fraud to exist, the court did not find it significant. Rather it focused upon what Coleman had done for BHG during the term of the lease. The trial court's theme was that, since Coleman had furnished inventory and other services to BHG, Glimcher was benefited through Coleman's efforts. This decision ended with the conclusion that: "Coleman reclaimed *its* inventory[.]" Yet, when questioned by the court, Sobczak testified:

> Q: Were there any occasions when any - - let me rephrase that. You would sell Coleman's Black Hills Gold to the Outlet (BHG)?
>
> A: Yes, sir.

The inventory was not Coleman's. It was owned by BHG under an open account with Coleman and Coleman had no security interest in BHG's assets.

> e. *The debtor absconded.* RCWA 19.40.041(b)(6).

[¶17.] BHG did not inform Glimcher that it was abandoning the lease and its obligations and leaving the mall. Coleman claims that mall employees found the doors closed and saw inventory being moved. While BHG's actions were not under the cover of darkness, knowledge of the closing and where the inventory was going were kept from Glimcher which is absconding.

> f. *The debtor removed or concealed assets.* RCWA 19.40.041(b)(7).

[¶18.] The trial court found no evidence concerning this badge of fraud. Yet, it is obvious that BHG, the debtor, removed assets from Washington and sent them to South Dakota and concealed the removal from Glimcher.

> g. *The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.* RCWA 19.40.041(b)(8).

[¶19.]    The role of "reasonably equivalent value" in actual fraudulent intent as compared to constructive intent is not the same although the meaning of the phrase is the same.  In the context of actual fraud, the absence of reasonably equivalent value is only one of the badges of fraud that courts consider in determining whether a transfer was made with fraudulent intent.  Its existence is not an absolute defense when other badges exist.  Thus, several badges of fraud could overcome a finding that reasonably equivalent value was given when actual fraud is considered.  *See, e.g.,* In re Spatz, 222 BR 157, 169 (NDIll 1998)(finding that under UFTA, reasonably equivalent value relates to only one of several badges of fraud); In re Model Imperial, Inc., 250 BR 776, 794 (BankrSDFla 2000)(the absence of reasonably equivalent value is only one of the badges of fraud that courts consider in determining whether a transfer was made with fraudulent intent under federal statute on which UFTA §4(a) is modeled).  However, absence of reasonably equivalent value is the essential component of constructive fraud.  Unless it is proven, constructive fraud cannot be found.

[¶20.]    We conclude that for the reasons discussed *infra* as this topic is reviewed when RCWA 19.40.041(a)(2) is considered, BHG did not receive a reasonably equivalent value from Coleman for the transfer.  For regardless of which context the phrase is considered in, its underlying purpose is consistently the same.

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors.  As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

In re Jeffrey Bigelow Design Group, Inc., 956 F2d 479, 484 (4thCir 1992). In the context of actual fraud, Glimcher was worse off because BHG's funds to pay Glimcher were totally depleted.

   h. *The debtor was insolvent or became insolvent shortly after the transfer was made or the obligations were incurred.* RCWA 19.40.041(b)(9).

[¶21.]    The trial court came to the conclusion that BHG was insolvent when the transfers were made to Coleman. "The transaction resulted in there being no assets whatsoever in the hands of BHG." All that was left were BHG's obligations. Thus, BHG was insolvent as its debts were greater than its assets. RCWA 19.40.021(a).

[¶22.]    Under Washington law, proof of actual intent to defraud must be "clear and satisfactory proof." Clearwater v. Skyline Construction Co., 835 P2d 257, 266 (WashCtApp 1992). Direct proof to establish an actual fraudulent intent is not required, as a debtor's subjective intent is often difficult to discern. Rather the court "should consider all relevant particulars encompassing a questioned transaction and weigh the factors negating as well as suggesting fraud." *Prairie Lakes Health Care Sys.*, 1998 SD 99 at ¶7, 583 NW2d at 411.[6] "'[A]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the "confluence of several can constitute conclusive evidence of an actual intent to defraud."'" *In re Model Imperial, Inc.* 250 BR at 791 (quoting In re XYZ Options, Inc., 154 F3d 1262, 1271 n17 (11thCir 1998)). There are numerous other badges of

---

6.    We note that the remaining holding in *Prairie Lakes Health Care Sys.* has no application to this appeal as that appeal involved SDCL 54-8A-5, UFTA §5, while this appeal revolves around UFTA §4 and its Washington counterpart.

fraud in the case which are sufficient to show that actual fraud occurred especially when the role of the insider is reviewed. We conclude that error was committed and the facts of this case clearly and satisfactorily demonstrate an actual intent to defraud, hinder or delay Glimcher.

## B. Constructive Fraud

[¶23.]    Glimcher also alleged that the transfer was constructively fraudulent under RCWA 19.40.041(a)(2) which provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> * * *
>
> (2)    Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (i)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (ii)   Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

*See also* UFTA §4(a)(2).

[¶24.]    Also, RCWA 19.40.051(a) provides:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably

-12-

> equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*See also* UFTA §5(a). In contrast to the evidentiary burden for actual fraud, constructive fraud under the UFTA need only be shown by "substantial evidence." *Sedwick*, 873 P2d at 531 (citing *Clearwater*, 835 P2d at 257).

[¶25.]    The issue is whether BHG received a "reasonably equivalent value" for the transfer of the inventory to Coleman. Coleman alleges that the reasonable equivalent value was the forgiveness of BHG's unsecured debt to Coleman for inventory in excess of $600,000. The trial court was distracted by the prior history between Coleman, BHG and Glimcher regarding the underlying lease agreement, guaranty under the lease and operation of the mall. However, that is not relevant to the issues in this case. BHG stipulated to the entry of judgment against it in Washington state court for the balance remaining under the lease. While Coleman's arguments regarding promissory estoppel and equitable estoppel may have been relevant as a defense in that action, BHG chose not to defend against that judgment. The trial court believed that Coleman proceeded in "extreme good faith" in continuing to supply inventory to BHG despite the losses it suffered.[7]

---

7.    The trial court stated in its memorandum opinion:

> Under the circumstances and recognizing that fraud is an equitable issue, equity certainly supports the premise that Coleman proceeded in extreme good faith in taking the actions which it did. Those actions were to the benefit of all of the creditors of BHG, including Glimcher, were clearly in good faith, and they were justified in taking the action they did, despite the original expectation of not being held accountable beyond the first year of operation of BHG.

However, "[t]he transferee's good faith is irrelevant to a determination of the adequacy of the consideration under this Act[.]" UFTA, §4, cmt (2). "The focus in 'constructive fraud' shifts from a subjective intent to an objective result." Badger State Bank v. Taylor, 688 NW2d 439, 447 (Wis 2004). "Proof of 'constructive fraud' simply entails proof of the requirements of the statute." *Id.* "The circuit court erred as a matter of law by focusing on the transferee's point of view. The transferee's subjective state of mind does not play a role in resolving the present case under [UFTA §5(a)]." *Id.* at 449.

[¶26.] RCWA 19.40.031(a) provides:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

"'Value' is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." UFTA, §3, cmt (2). *See also Clearwater*, 835 P2d at 267. While satisfaction of an antecedent debt can satisfy the requirement of reasonably equivalent value, this Court concludes that it did not under the unique facts of this case. From the perspective of Glimcher, an unsecured creditor, the cancellation of BHG's unsecured debt owed to Coleman, an insider, when BHG was insolvent both before and after the transfer, was of no benefit to either BHG or other creditors. *Clearwater,* 835 P2d at 267. The transfer of BHG's inventory to an insider left it without any assets and resulted in it going out of business entirely.

[¶27.]     This Court finds that the trial court erred as a matter of law in focusing on the transferee's, Coleman's, point of view. Further, this Court holds that Coleman's satisfaction of BHG's debt was not reasonable equivalent value under the UFTA.

ISSUE TWO

The Estoppel Issue

A. Promissory Estoppel

[¶28.]     Coleman claims that both promissory estoppel and equitable estoppel apply which prevents Glimcher from seeking relief under the UFTA. Coleman argues that, since it had a limited obligation to pay rent under the guarantee, any judgment Glimcher has against BHG for rent cannot be enforced against it by the UFTA as this would violate the guarantee. Coleman cites RCWA 19.40.902 which allows estoppel as a defense in UFTA proceedings. At the hearing, Sobczak testified that, if he knew that Coleman could be sued, he never would have formed BHG or had Coleman execute the guarantee. We believe the trial court erred in applying estoppel to this proceeding.

[¶29.]     Washington recognizes both promissory estoppel and equitable estoppel. In Klinke v. Famous Recipe Fried Chicken, 616 P2d 644, 646 n2 (Wash 1980), promissory estoppel was defined as: "'(1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only [by] enforcement of the promise.'" (quoting Corbit v. J.I. Case Co., 424 P2d 290, 300 (Wash 1967)). The function of promissory estoppel is to enforce a promise made without consideration.

King v. Riveland, 886 P2d 160, 164 (Wash 1994); Elliot Bay Seafoods, Inc. v. Port of Seattle, 98 P3d 491, 494 (WashCtApp 2004). If there is consideration given with the promise, the agreement is the contract which is enforced. In Greaves v. Medical Imaging Systems, Inc., 879 P2d 276, 281 (Wash 1994), the Washington Supreme Court held: The purpose of promissory estoppel is "'to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. *If the promisee's performance was requested at the time the promisor made his promise and that performance was bargained for, the doctrine is inapplicable.*'" (emphasis added)(quoting *Klinke*, 616 P2d at 648 n4). This case involves bargained for promises and performances which were the consideration. Glimcher's predecessor wanted Coleman to open a store in the new mall. Coleman was reluctant to do so because the mall had no record of performance. When Coleman formed BHG, the mall owner was also reluctant to sign a lease with a new corporation. After negotiations the parties agreed that Glimcher would sign the lease with BHG, if Coleman would guarantee the lease for one year. The parties agreed and a contract was formed. Because there is a contract, promissory estoppel cannot apply. Coleman wants to extend the guarantee to cover other matters not part of the agreement and not promised. There is no language in the guarantee which can be construed as an exoneration of any future claims, Sobczak's trial testimony notwithstanding. Glimcher honored the contract. It is not suing Coleman for rent. It is seeking to avoid a fraudulent transfer of BHG's assets.

## B. Equitable Estoppel

[¶30.]     Equitable estoppel in Washington requires: "(1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied" upon the act, statement or admission. Berschauer/Phillips Const. Co. v. Seattle School Dist No. 1, 881 P2d 986, 994 (Wash 1994). We also conclude that the concept of equitable estoppel has no application to this case.

[¶31.]     Coleman claims that it was supplying inventory to BHG and that Glimcher was thereby being enriched "through its subsidy" of BHG. Coleman goes on to argue that Glimcher was a poor manager of the mall which caused the loss of several anchor stores and these losses had an impact upon BHG's sales. Coleman also urges that Glimcher is estopped from making any claim for rent because of events surrounding the guarantee. Somehow, Coleman believes that these facts require the application of equitable estoppel. We disagree.

[¶32.]     Coleman's position ignores the separate corporate identity of Glimcher, BHG and itself. It blurs the separate obligations one corporation had with another. Coleman improperly argues potential defenses BHG had for its own benefit. For example, Coleman claims Glimcher was a poor manager of the mall. If correct, this serves to benefit BHG which was the party to the lease, not Coleman. BHG could have raised this in defense of the breach of lease litigation in Washington, but did not. Instead BHG stipulated to a judgment.

[¶33.]     Coleman's claim for injury against Glimcher also ignores the separate corporate identities of Coleman and BHG. Coleman supplied inventory to BHG and BHG became indebted to Coleman. Glimcher was not involved with Coleman's

decisions on the quantity of inventory to supply or the amount of debt to incur with BHG on open account. Coleman could have secured its debt and chose not to do so. Based upon these facts, it is difficult to conclude that Glimcher caused any injury to Coleman.

[¶34.] We reverse the trial court and remand this case for proceedings consistent with RCWA 19.40.071.[8]

---

8. RCWA 19.40.071 provides:

(a) In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in RCW 19.40.081, may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by chapter 6.25 RCW;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

(i) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(ii) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(iii) Any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

[¶35.]      KONENKAMP, Justice, concurs.

[¶36.]      ZINTER, Justice, concurs in result.

[¶37.]      GILBERTSON, Chief Justice, and MEIERHENRY, Justice, dissent.

[¶38.]      KEAN, Retired Circuit Judge, for SABERS, Justice, disqualified.

ZINTER, Justice (concurring in result).

[¶39.]      I respectfully disagree with those parts of the Court's opinion concluding that reasonable equivalent value was not given for the transfer of BHG's assets.  *See supra* Part A (actual fraud) and Part B (constructive fraud).  I do so because those Parts analyze the reasonable equivalent value question from the perspective of Glimcher, the creditor challenging the transfer.  *See supra* ¶¶20, 26.  In my view, the reasonable equivalent value question should not be viewed from the perspective of the unsecured creditor challenging the transfer.  Rather, the question must be viewed from the perspective of the debtor, the debtor's estate, and all unsecured creditors.  And, when viewed from that perspective, reasonable equivalent value was given because both BHG and the unsecured creditors benefited from this transfer.  Therefore, constructive fraud cannot be established.  Nevertheless, I concur in result because, when the remaining "badges of fraud" are considered, actual fraud was established.

*Reasonable Equivalent Value- Constructive Fraud*

[¶40.]      In concluding that constructive fraud was established, the Court reasons that the transfer, *from the perspective of Glimcher*, conveyed no benefit to BHG or other creditors.  *Supra* ¶26 (emphasis added).  This view, prefacing the analysis from the perspective of the challenging unsecured creditor, overlooks the statutory definitions of reasonable equivalent value and cases interpreting the

UFTA.  It also impermissibly interjects the concept of preferences into §4(a)(1) and (2) of the UFTA.

[¶41.]　　　The Washington version of the UFTA on constructive fraud requires that the reasonable equivalent value question be analyzed solely from the perspective of the debtor.  RCWA 19.40.041(a)(2) (UFTA §4(a)(2)) provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if *the debtor* made the transfer or incurred the obligation:. . .
> (2) *Without receiving a reasonably equivalent* value in exchange for the transfer or obligation. . . .

*Id*. (emphasis added).  The UFTA comment to the Washington definition of value, RCWA 19.40.031(a) (UFTA §3(a)), further clarifies the proper perspective.  That comment makes no reference to the challenging creditor's point of view.  Rather, it confirms that reasonable equivalent value is to be determined from the perspective of all unsecured creditors and the debtor's estate.  The comment explains:

> "Value" is to be determined in light of the purpose of the Act to protect a *debtor's estate* from being depleted to the prejudice of the *debtor*'s *unsecured creditors*.  Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.

UFTA §3 cmt 2 (emphasis added).

[¶42.]　　　Courts interpreting the UFTA also recognize that the proper focus is on the net effect of the transfers on the debtor's estate and the funds available to pay all of the unsecured creditors.

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

#24163

*In re Jeffery Bigelow Design Group, Inc.,* 956 F2d 479, 484 (4thCir 1992).[9] Today the Court also acknowledges the proper focus in restating the purpose of UFTA: "The purpose of the UFTA is to protect a *debtor's estate* from being depleted to the prejudice of the debtor's unsecured creditors." *Supra* ¶9 (emphasis added). Therefore, our analysis should focus only on whether BHG (the debtor), its estate, and the unsecured creditors as a group received reasonably equivalent value in exchange for the transfer to Coleman.

[¶43.] When viewed from this perspective, reasonable equivalent value was given because there is no dispute that "an antecedent debt [was]. . . satisfied" for value exceeding that debt. RCWA 19.40.031(a) (UFTA §3(a)). *See also* ¶25, *supra.* BHG transferred approximately $300,000 in assets for the forgiveness of approximately $600,000 in unsecured debt. *See supra* ¶¶5, 25. Consequently, this transfer reduced the debtor's estate's total unsecured debt by approximately $300,000 more than the value of the assets transferred. Considering this $300,000 net improvement in the estate's unsecured debt, BHG and all remaining unsecured creditors received value even if Glimcher did not personally benefit.

[¶44.] The Court's focus on Glimcher's perspective is also misplaced because it interjects the concept of preferences into the analysis. Concededly, the transfer to Coleman was preferential when viewed from the perspective of Glimcher, apparently the only unsecured creditor who received nothing from all of the transfers. However, viewing the question from the perspective of an unsecured

---

9.   *Bigelow* ultimately held that those transfers were not fraudulent because they did not result "in the depletion of the bankruptcy estate. . . [t]he transfers by the debtor served simply as repayment for money received." *Id.* at 485.

-21-

creditor who receives less than the others improperly interjects the concept of preferences into the constructive fraud provisions of RCWA 19.40.041(a)(2), (UFTA §4(a)(2)).[10]

[¶45.]     This case deals with fraudulent transfers, not preferences, and preferential transfers are not inherently fraudulent.  In construing the UFTA generally, we have recognized this rule stating: "[D]ebtors may generally prefer one creditor over another in applying assets to discharge their obligations[.]" *Prairie Lakes Health Care Sys., Inc.*, 1998 SD 99, ¶14, 583 NW2d at 413.[11]  Other courts, in discussing both constructive and actual fraud, also recognize that some creditors may be preferred over others.  *See* Liquidation of MedCare HMO, Inc., 294 IllApp3d 42, 52, 689 NE2d 374, 381 (1997) (concluding that when analyzing fraud under similar provisions of the UFTA, "the mere preference of one or more creditors over others does not constitute a fraudulent transfer."); Garton v. Garton, 533 NW2d 828, 832 (IA 1995) (construing the common-law "badges of fraud" that underlie the UFTA, noting that, "a debtor may prefer one creditor over another."); In re Stein,

---

10.    It also improperly interjects the concept of preferences into the actual fraud provisions of RCWA 19.40.041(a)(1), (UFTA §4(a)(1)).

11.    This Court did note that some preferences may be voided under  SDCL 54-8A-5(b) (UFTA §5(b)), which provides:

>    A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

*Id.*

Washington has the same provision codified at RCWA 19.40.051(b).
However, this preference provision has not been raised or argued on appeal.

208 BR 209, 215 (DOr 1997) (discussing constructive fraud and stating: "A debtor may prefer one creditor over another. . . .").

[¶46.]     Therefore, even if this were a preferential transfer when viewed from Glimcher's perspective, that does not establish a lack of reasonable equivalent value and a fraudulent transfer. When viewed from the proper perspective of the debtor, its estate, and the unsecured creditors generally, reasonably equivalent value was given. And because reasonable equivalent value was given, Glimcher cannot establish constructive fraud in this proceeding. As the Court notes, the "absence of reasonably equivalent value is the essential component of constructive fraud. Unless it is proven, constructive fraud cannot be found." *Supra* ¶19; RCWA 19.40.041(a)(2).

*Reasonable Equivalent Value- Actual Fraud*

[¶47.]     For the foregoing reasons, the Court also errs in concluding that Glimcher established the lack of reasonably equivalent value "badge of fraud" under RCWA 19.40.041(b)(8). That provision, like the constructive fraud provision, requires an examination of the reasonably equivalent value question from the perspective of the debtor. It provides:

> The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

*Id*. The Court, however, again views the question solely from the perspective of Glimcher, concluding that this badge of fraud was established because "*Glimcher* was worse off because BHG's funds to pay *Glimcher* were totally depleted." *Supra* ¶20 (emphasis added).

[¶48.]    Nevertheless, for the other reasons expressed by the Court, the remaining "badges" established fraud.  In my view, this conclusion is especially compelled because, as the Court notes, this transfer was accomplished between insiders: the joint owners of BHG and Coleman.  *See supra* ¶13 (quoting UFTA §4 cmt 5).  *See also* ¶¶13-18, 22.  "Transactions involving corporations and their executives or corporations under the common control of the same officers and directors are to be regarded with skepticism by the courts and closely scrutinized."  Snyder Elec. Co. v. Fleming, 305 NW2d 863, 867 (Minn 1981).  "The relationship between the parties is a significant consideration."  New Horizon Enterprises, Inc. v. Contemporary Closet Design, Inc., 570 NW2d 12, 16 (MinnApp 1997).

[¶49.]    Considering this relationship and the other badges of fraud discussed by the Court, I agree that the circuit court erred as a matter of law and actual fraud was established.

MEIERHENRY, Justice (dissenting).

[¶50.]    I would affirm the trial court as neither clearly erroneous in its findings of fact nor erroneous in its application of the law.  First in reviewing questions of fact, we use the clearly erroneous standard.  Prairie Lakes Health Care Sys. Inc. v. Wookey, 1998 SD 99, ¶5, 583 NW2d 405, 410.  Under this deferential standard of review, we will not overturn the trial court's factual findings "unless we are definitely and firmly convinced a mistake has been made."  *Id*. (additional citations omitted).  The trial court found no fraudulent transfer under the UFTA based on the unique circumstances surrounding BHG and Coleman's relationship and course of dealing over the five years BHG operated in Washington.  The

majority opinion gives no deference to the trial court's factual determinations and appears to retry every element of actual and constructive fraud de novo.

[¶51.] The majority opinion determines that the trial court erred when it concluded that Glimcher failed to establish there had been actual intent to hinder, delay or defraud creditors. Specifically, the majority opinion alleges that the trial court erred when it considered the objective factors in RCWA 19.40.041(b) because it focused on the actions of Coleman instead of BHG and because it overlooked certain factors. However, this conclusion fails to give deference to the trial court's ability to judge the credibility of the witnesses and weigh the evidence. *Prairie Lakes Health Care Sys. Inc.*, 1998 SD 99, ¶11, 583 NW2d at 412 (stating that "[t]he circuit court is in the best position to assess the witnesses' credibility and the weight to be given their testimony, and we give great deference to the circuit court's opportunity to observe the witnesses and testimony first hand."). In addition, the majority opinion fails to acknowledge the specific facts of this case, which the trial court concluded took BHG out of the realm of the UFTA.

### 1. Actual Fraud

[¶52.] RCWA 19.40.041(b) provides a non-exclusive list of factors to consider when determining whether the debtor had the intent to hinder, delay or defraud creditors. The statute provides: "In determining actual intent under subsection (a)(1) of this section, consideration may be given, among other factors. . . ." RCWA 19.40.041(b). The language of the statute allows courts flexibility when analyzing actual intent. Pursuant to the language of RCWA 19.40.041(b), courts "should evaluate all the relevant circumstances involving a challenged transfer or

obligation. Thus the court may appropriately take into account all indicia negativing as well as those suggesting fraud." UFTA §4, cmt(6).

[¶53.]     In this case, the trial court's decision specifically rested on the unique circumstances surrounding the relationship between BHG and Coleman. BHG had been operating at a loss for the majority of the past five years. To its detriment, Coleman continued to supply it with inventory to keep the mall store in business. During this time, BHG paid its creditors, including Glimcher, despite the fact that it continued to operate at a loss. Based on these facts, the trial court noted:

> The case at hand presents a very unique set of circumstances, none of which parallel any of the cases reviewed by this Court. Perhaps the extraordinary point in this case is that every effort was made by Coleman on behalf of BHG to pay all obligations at the time of the closing of BHG. They went to great efforts to wind down a business in a manner which would not deny the creditors of BHG receipt of monies then owed to them.

[¶54.]     The trial court also acknowledged that at first glance, the facts portrayed Coleman as an insider who was "trying to take advantage of its relationship with BHG to remove all assets of value for its own benefit, leaving BHG's creditors to fight over the scraps." However, Sobczak's testimony at trial indicated that in the course of negotiating a lease with the mall, Supermall, the lessor at the time, understood and agreed that BHG would be created as a Washington corporation for the express purpose of isolating liability against Coleman in the event the mall store was not profitable. Therefore, Coleman was not some secret entity waiting in the wings to prevent BHG from being liable to any of its creditors. Coleman was the party that the mall dealt with during the initial contract negotiations and was the party that kept BHG in business despite the fact that it operated at a loss for four of the five years. The trial court found that these

facts negated a finding that BHG had actual intent to hinder, delay or defraud Glimcher. The trial court stated:

> Coleman at no time took advantage of any of the other creditors by the actions which it took in supporting the ongoing operation of BHG. . . . It struggled to maintain a business despite its losses and to honor its contracts and agreements with all obligors of BHG. . . . Coleman proceeded in extreme good faith in taking the actions which it did.

[¶55.] Based on the circumstances surrounding the formation of BHG, the course of dealing over the past five years between BHG and Coleman and the fact that BHG had satisfied all of its outstanding debts at the time it closed its mall store, except for those still owed to Coleman, the trial court concluded that Coleman or its agents had no intent to hinder, delay or defraud any of its creditors. This was a question of fact involving an inquiry into the intention of the parties. *See* Ed Peters Jewelry Co., Inc. v. C&J Jewelry Co., Inc., 124 F3d 252, 261-62 (1stCir 1997) (stating that "it is a question of fact whether a transfer was made with actual intent to defraud."). The trial court, as the finder of fact, was in the best position to judge the credibility of the parties. *Prairie Lakes Health Sys. Inc.*, 1998 SD 99, ¶11, 583 NW2d at 412. Based on our deferential standard of review, this finding was not clearly erroneous.

### 2. *Reasonably Equivalent Value*

[¶56.] The trial court also concluded that BHG received reasonably equivalent value for the transfer of inventory to Coleman. The majority opinion claims that the trial court was distracted by the history between BHG and Coleman. In addition, the majority opinion finds that the trial court erred as a matter of law by focusing on the transfer of BHG's assets from Coleman's point of view.

[¶57.] "Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of facts." *Prairie Lakes Health Care Sys., Inc.,* 1998 SD 99, ¶11, 583 NW2d at 412 (citing Leibowitz v. Parkway Bank & Trust Co., 210 B.R. 298 (NDIll 1997)). When we review the transfer, we must ultimately examine "what [the] debtors received in exchange for what they surrendered." *Id.* (additional citations omitted). Accordingly, the facts indicate that BHG did receive reasonably equivalent value for the transfer of assets to Coleman.

[¶58.] At the time BHG closed its doors, it had $290,000 worth of inventory and owed Coleman over $700,000 for supplying it with inventory. BHG also had a lease with Glimcher until July of 2002, which was current up until the time it closed its doors at the mall. The trial court concluded that BHG received value in not only the value of the inventory that was credited to the benefit of the debt against BHG, but also the value of maintenance of BHG for the previous years at which BHG operated at a loss to the detriment of Coleman. Consequently, based on these facts, the trial court's finding that BHG received reasonably equivalent value was not clearly erroneous.

[¶59.] Because I believe that the trial court should be affirmed as to the UFTA, I would not address the promissory or equitable estoppel issues.

[¶60.] GILBERTSON, Chief Justice joins this dissent.